[Civ. No. 31537. Second Dist., Div. Four. Nov. 7, 1968.]

JOHN C. OAKES et al., Plaintiffs and Respondents, v. McCARTHY COMPANY et al., Defendants and Appellants.

Pollock & Deutz, Pollock & Palmer, John P. Pollock, William Elliot Viney, Russell & Schureman, Theodore W. Russell and Robert W. Hancock for Defendants and Appellants.

Ball, Hunt, Hart & Brown and Frank C. Aldrich for Plaintiffs and Respondents.

238

AISO, J. pro tem.*—Plaintiffs, John C. Oakes and Grace Oakes, husband and wife, brought this action to recover damages resulting from earth movement underlying their lot and home in the Palos Verdes area of Los Angeles County, which they had acquired in 1956 as original purchasers in a subdivision.

The action, filed on December 20, 1960, was eventually tried to a jury against the defendants, the McCarthy Company, a California corporation (hereafter "McCarthy"), the Rollingwood Estates Company, a co-partnership composed of nine other named corporations (hereafter "Rollingwood"), the J. A. Thompson & Son, Inc., a California corporation (hereafter "Thompson"), and the Donald R. Warren Co., a California corporation (hereafter "Warren"). The jury returned verdicts against the plaintiffs and in favor of the defendants Rollingwood, its nine partner corporations, and Thompson. It returned three verdicts[1] in favor of plaintiffs and against (1) defendant Warren for $14,825 compensatory damages, (2) defendant McCarthy for $14,825 compensatory damages, and (3) defendant McCarthy for $77,500 punitive damages. Judgment was entered on the verdicts.

Warren's motion for judgment notwithstanding the verdict was denied. It appeals from the judgment *and* from the order denying said motion. Defendant McCarthy's motion for new trial was denied, conditioned upon plaintiffs remitting punitive damages from $77,500 to $59,300. Plaintiffs filed a written consent to the remittitur. Defendant McCarthy appeals from the judgment, as thus modified.

### Contentions on Appeal

Warren's contentions on appeal may be grouped under three main headings: (1) There was no legal duty from Warren to the plaintiffs upon which liability for negligence can be predicated. (2) The action was barred by the statute of limitations. (3) The jury fees' portion of the costs should have been apportioned by deducting the amount attributable to the trial time consumed by plaintiffs' unsuccessful attempt to establish claims against the other defendants who prevailed against plaintiffs. (4) The judgment, insofar as it assesses

---

*Assigned by the Chairman of the Judicial Council.

[1]The jury also returned a verdict, as directed by the court, in favor of defendant Warren on the issue of fraud. By its answers to special interrogatories, it indicated that the basis of their imposing liability on defendant McCarthy was both negligence and fraud.

compensatory damages in identical amounts of $14,825 against both defendants, is a joint and not a several judgment.

McCarthy contends: (1) The evidence is insufficient to support either the liability against it for fraud or the punitive damages awarded. (2) The negligence cause of action was barred by the statute of limitations. (3) Procedural errors were committed by the trial court in: (a) permitting a jury trial, (b) permitting an amendment to the pleadings of the fraud cause of action, (c) permitting evidence of earth movement under lots other than plaintiffs', and (d) refusing to submit its request for special findings to the jury. (4) It adopts the contentions (3) and (4) advanced by Warren as to costs and the judgment as to compensatory damages being joint, rather than several.

## The Factual Background[2]

Early in 1955, McCarthy purchased undeveloped acreage in the Palos Verdes section of Los Angeles County, undertook subdivision activities, and constructed homesites and residences thereon for sale to the general public. Tract 21270 (originally designated as Tentative Tract 21269) containing Lot 74 (hereafter "Oakes' property"), later purchased by plaintiffs, was the first tract to be so subdivided.

McCarthy was a California corporation, its stock was owned by E. Avery McCarthy and his brother, James H. McCarthy, in equal shares, except that fifteen shares of E. Avery McCarthy's 50 percent were owned by his son, and five shares of James H. McCarthy's 50 percent were owned by James' wife. E. Avery McCarthy was the president. James H. McCarthy was the vice-president and secretary. The duties, responsibilities, and power of decision were divided between the two brothers.

McCarthy commenced development of the tract encompassing the Oakes' property in 1955, arranging for the civil engineering, the preparation of the tract map, and planning

[2]Condensation of the relevant facts has not been an easy task. The reporter's transcript alone runs over 3,100 pages. Plaintiffs introduced 143 exhibits, and the defendants 32. Neither defendant observed the rule, " 'Where an appellant claims that some particular issue of fact is not sustained by the evidence, he is required to set forth in his brief all of the material evidence on the point and not merely his own evidence.' " (*Schaefer* v. *Berinstein* (1960) 180 Cal.App.2d 107, 123 [4 Cal.Rptr. 236].) Trial commenced on December 14, 1965, and the jury verdicts were returned on February 11, 1966. Pleading problems and an inadequate pretrial order further complicated this review.

matters incident to normal subdivision activities, including the grading operations.

McCarthy employed the Engineering Service Corporation (apparently not joined in this action) for the purpose of preparing the tentative tract maps and a grading plan. On March 15, 1955, McCarthy filed an application wtih the Federal Housing Administration (hereafter ''FHA'') to obtain that agency's commitment to give mortgage insurance in connection with homes to be sold in the tract. For such a commitment, the FHA required inter alia: (1) a ''preliminary soils investigation'' and (2) a ''report of compaction'' prepared and submitted by a ''recognized soil or foundation engineer.''

McCarthy engaged Warren orally on April 22, 1955, for its engineering services in connection with this tract development.[3] A copy of the grading plan for Tract 21270 prepared by Engineering Service Corporation was furnished to Warren. On May 22, 1955, Warren submitted its written preliminary soils investigation report to McCarthy. McCarthy delivered the report to the FHA.

In August of 1955, McCarthy entered into a written contract with Thompson[4] to do the cutting, filling and grading ''according to the grading plans furnished by Engineering Service Corporation for said tract, and to carry out said work in accordance with the requirements of the office of the County Engineer of the County of Los Angeles and F.H.A. specifications.'' McCarthy designated a George R. Sant,[5] as its agent to inspect the work. The contract also provided, inter alia, ''When the Contractor (Thompson) is making a fill on lots, such work shall be prosecuted only in the presence of an engineer or inspector supplied by Donald Warren and Company, and any work done in the absence of such engineer or inspector shall be subject to rejection.'' The contract containing this clause was received without restrictions as to any particular defendant.

The cutting, filling and grading operations on Tract 21270 (which included the Oakes' property) commenced in August 1955, and continued until the latter part of April 1956. The portion of such operations relating to the Oakes' property

---

[3] The nature and scope of Warren's undertaking is one of the main items of dispute between plaintiffs and Warren.

[4] One of the defendants exonerated by the jury.

[5] A minority shareholder in each of the nine corporate partners of the Rollingwood Estates partnership.

was performed on November 28-29, and December 12-13, 1955, and some additional grading work in the area of Lots 57-75 was done on February 15 and 23, 1956.

Warren had a field inspector in its employ, who was present at the tract for a substantial portion of each day that grading operations were in progress. It was his duty as Warren's representative to direct Thompson on how to place the fill and compact it and to generally supervise the job of cutting, filling, and benching the soil. This field inspector was subsequently discharged by Warren, partially for the reason that he failed to make sufficient tests of compaction on Tract 21270. No compaction test was run on Oakes' Lot 74.

Engineers and laboratory technicians employed by Warren also participated in the soils engineering activities which culminated in the report on compaction relating to Tract 21270.

On March 22, 1956, Warren issued its report on compaction of Tract 21270. Copies of said report were distributed by Warren to McCarthy, the FHA, the County of Los Angeles, and McCarthy's architect.

On March 26-28, 1956, after the report on compaction had been submitted, Thompson did some additional grading for driveways, garbage pads and wall excavations on Lot 74 and an adjacent lot. Construction of Oakes' house began March 29, 1956, and was completed in early September, 1956. the plaintiffs took possession on September 7, 1956. The finish grading was done by a contractor other than Thompson while the house was under construction by use of dirt previously stockpiled by Thompson at the rear of the building pad area. While McCarthy was still the owner of the land which included Tract 21270, nine California corporations were formed on or about August 15, 1955. The nine corporations then formed a partnership under the name ''Rollingwood Estate Company.'' All of these nine corporations and partnership had been dissolved prior to April 19, 1957.

During the existence of the partnership and the nine corporations, the common stockholders in each corporation were E. Avery McCarthy, James H. McCarthy, George R. Sant, Merlin W. Sant, W. E. Viney, and S. Edward Tomaso. E. Avery McCarthy and James H. McCarthy, who owned substantially all of the stock of McCarthy, also owned more than 50 percent of the common stock in each of the nine corporations. Mr. Viney, an attorney, and Mr. Tomaso, a certified public accountant, obtained their shares of the common stock in the nine corporations in lieu of fees for services rendered.

The minority interests of George R. Sant and Merlin W. Sant in the nine corporations were acquired because the Sants, who were builders, desired to make the development of the tract a joint venture with McCarthy.

On or about September 15, 1955, McCarthy filed a subdivision map with the County of Los Angeles and obtained permission from the county to subdivide the tract into single family residential lots.

On or about October 17, 1955, McCarthy conveyed the land in Tract 21270, including the Oakes' property, to the nine corporations, each corporation obtaining a number of lots in the tract in exchange for the issuance of its own preferred stock to McCarthy.

The development, management and sale of the tract and homes were thereafter under the general ownership and direction of Rollingwood. However, McCarthy, by contract, was retained by Rollingwood as its sales agent and received commissions for sales by it from Rollingwood. The transfer of the land to the Rollingwood partners effected no change of substance in the tract development. The same people were kept on the project and the ''same topics of action'' were continued.

McCarthy continued as the sponsor of the project vis-a-vis the FHA. McCarthy had orally requested the substitution of Rollingwood as the sponsor after the transfer of the land, but FHA refused the change. Even after the transfer to Rollingwood, Warren continued making all of its reports to McCarthy. The grading contract between McCarthy and Thompson remained in force.

As noted above, the sales of the homes were handled by McCarthy, despite the conveyance of the ownership of the tract to members of Rollingwood. Donald McCaffrey acted as the tract sales manager and supervised a Mr. Schultz, a salesman. McCaffrey also participated in sales efforts himself. He had arrived on the tract when grading activities were just commencing.

McCaffrey was never instructed to conceal or withhold from prospective purchasers any information about the existence of fills or about drainage of the properties. He was further affirmatively instructed to tell prospective purchasers about the fills, *if they should ask*. As to those who did not inquire, however, he saw no need to take the initiative in raising the question of a fill, because to him it was apparent to anyone that fills were involved. One could see the cut and fill on the lots across the street from the model homes. The model homes were on filled land and all the lots in the entire subdivision

were either on cut or fill, or a combination of both. James McCarthy, the vice-president of defendant McCarthy, acknowledged that he did not instruct salesmen to disclose to prospective buyers what parts of the lot they were about to buy were fill or cut. Neither did he give instructions to conceal the fact.

The plaintiff John C. Oakes saw an advertisement in the Los Angeles Times in the fall of 1955 regarding the tract called Rollingwood Estates. It contained an artist's rendition of one of the proposed homes, the name of McCarthy as the developer, a price range, and the types of financing available, including FHA financing. Oakes went to the site advertised and examined the model homes on the tract. He talked to a salesman (either McCaffrey or Schultz) in the tract office and was given a brochure, which described the tract and model homes in a general way. Oakes also saw a tract map in the tract office. It showed the location of the lots and streets, the elevations of the various building pads, and the direction and extent of view from each lot.

The plaintiffs returned to the tract four or five times in the fall of 1955, and on each occasion conversed with the salesmen. No specific request to view the lots was made by plaintiff John Oakes, but the salesmen had indicated that such inspection was not then possible as the roads were not yet passable. A few days before January 1, 1956, plaintiffs chose Lot 74 as the lot they desired, because they wanted a view lot, and also designated which model home they wanted. The only discussion between plaintiffs and the salesmen was concerning the view of the lot.

On January 1, 1956, plaintiffs signed a deposit receipt, giving the salesman a check for $300 as a deposit. The total purchase price reflected by the deposit receipt was $22,500 with the balance in excess of $5,000 down payment to be paid in installments under a "conventional loan." At no time during the negotiations did the plaintiffs or either of them inquire whether there was any fill on the lot which they had selected for purchase. And no statement about any fill was volunteered by the salesmen. In fact, Lot 74 (Oakes' property) had been rough graded by January 1, 1956, and the fill was in place. The fill extended to a depth of approximately 17 feet at the northeast corner of the building pad, and gradually became more shallow so that it daylighted about halfway through the building pad on a line roughly running from the northwest to the southeast.

The Oakes' property is substantially rectangular in shape, having a frontage of 76 feet on Elmdale Avenue and running to a depth in a northerly direction 140 feet on the westerly boundary line, and 125.34 feet on the easterly boundary line, with a dimension along the northerly line of 77.4 feet. The house faces in a southerly direction toward Elmdale Avenue and the lot is below the street level of Elmdale. There are improvements between the house and Elmdale Avenue consisting of a garage, a driveway and a planter box. The usable portion of the backyard extends from the back of the house to an ornamental fence labelled, "protective fence" on Exhibit T. The portion of the lot beyond this protective fence and the northly boundary line slopes downward on an incline somewhat sharper than 1½ to 1.

The rough grading, in accordance with the grading plan, was such that drainage of the lot was to the rear. Neither of the plaintiffs made any inquiry about the drainage prior to purchase.

Another deposit receipt was signed on March 4, 1956, changing some of the terms of the prior deposit receipt. Nothing was said about filled ground or drainage. Plaintiffs were first on the property about the time the forms for the foundations had been laid. The only inquiry they made was when they would be able to move into their house.

The plaintiffs moved into their new home on September 7, 1956, and continued to reside there up to the time of trial. The grant deed ran from Rollingwood to plaintiffs. It was executed by Rollingwood Estate Company, a partnership, by Dunwood Corporation (one of the nine partner corporations) in turn by James McCarthy, president, and S. Edward Tomaso, secretary. The purchase was financed in part by notes secured by trust deeds, but *these obligations were not FHA guaranteed.*

Plaintiff John Oakes testified that he did not have any knowledge prior to moving into the house that it rested on filled ground, that no one had told him of it. He claimed that he first learned that it was filled ground after making a claim for damages to their insurance company in the early part of 1958. He further testified that if plaintiffs had known of their property being on filled land, they would not have purchased it.

At the time the plaintiffs moved into their home, McCaffrey accompanied them as they went through the house and checked various items. At the time, plaintiffs were given a written certificate of guaranty of workmanship and materials.

It read that the expiration date of the guaranty was September 7, 1957, and under the word, ''CONSTRUCTION,'' there was further written, ''This house was constructed under Los Angeles County Building Code and Federal Housing Administration and Veterans Administration construction requirements. It was inspected by County and FHA inspectors. *These inspectors are your assurance that* this building has been properly constructed, and *all the lot area properly graded.*'' (Italics supplied.) It also stated under, ''ALTERATION OF PLANS OR GRADE,'' that no warranty or guarantee was given for conditions arising from structural alteration or additions, of changes in grade, drainage, slope, berms, or excavations of any kind unless done by Rollingwood.

Plaintiffs also signed, at the same time, a document entitled, ''Slope and Drainage Agreement on Lot Draining to Rear.'' It provided in part that based upon the plaintiffs' understanding that the grades, slopes, and embankments of the property had been established by the builder and inspected and approved by the FHA and the county building department and that the same conform to the mortgage insurance requirements of the FHA and VA (Veterans Administration), *plaintiffs understood that the lot was established to drain to the rear of the lot* and would not permit the flow of any water contrary thereto.

A check list given to the salesmen of subjects to be covered at the time possession of a home is accepted by a buyer provided, inter alia, ''Explain that this hillside grading and construction of his home is a special, high-class delicate job like a special car and needs care and maintenance like one would give such a car.'' McCaffrey testified that he went through all the items shown on the ''Slope and Drainage Agreement on Lot Draining to Rear.''

A request for repairs executed on September 7, 1956, makes note of a crack on the rear patio slab. Plaintiff John Oakes explained that he did not think much about it after being assured by McCarthy's salesman that most cement work has some hairline cracks in it.

During the spring and early summer of 1957, plaintiffs added to the paved patio area in their backyard, installed a cement walk along the easterly side of their house, a drainage sump near the street, and placed additional earth along the westerly side and in the unpaved portions of the rear yard. These alterations changed the direction of the drainage of the surface waters on the Oakes' property. Later in 1957, plain-

tiffs added a room by enclosing a breezeway, enlarged their garage, and constructed a wall and a planter area near the street.

The Oakes' property and the house constructed thereon have been damaged as the result of a gradual movement of the fill downhill along the natural slope in a northeasterly direction. The motion had not come to rest at time of trial and there was expert testimony that as additional movements occur the conditions will become worse and may develop into a sizeable and catastrophic slide. The fill at the northeast corner of the house as of the time of trial had moved about 3 inches in a northeasterly direction. A large and significant amount of stress had been caused to the house by this slippage or creeping of the underlying soil, causing it to move away from the piers on which it rested, and, among other things, a wracking of window frames, breaking of glass panes, and a cracking of the walls of the house resulting.

The cause of this earth movement is that the expansive black clay (adobe) soil, which does not have adequate strength to resist the shearing forces, was left without its being removed down to rock level and the permeable nature of the fill above, resulting from low compaction and the presence of boulders. The permeable fill permitted water to percolate down through it and to come in contact with the black clay, causing the clay to both expand and to creep, because the moisture reduced its strength against shearing. The soil on the Oakes' property was not compacted with sufficient density to conform to the prevailing good soils engineering practice of the time.

In order to stop this movement of the underlying soil on the Oakes' property, it would be necessary to remove the fill and the underlying black expansive clay, bench the fill from the rock level, and then replace the fill with properly compacted fill material. This would necessitate removing of the house from the lot.

It is appropriate, in fact necessary, to mention a few additional facts which bear upon the statute of limitations defense raised by both Warren and McCarthy. As mentioned above, a hairline crack in the patio cement was noted when the plaintiffs accepted the house in September of 1956. This crack, however, did not widen until later, between March and May 1958. In May, 1958, it became about a quarter-inch in width. Also on September 7, 1956, plaintiff John Oakes noted a crack in the stucco in the northeast corner of the house. But it was still a hairline crack in February of 1958, and had been fixed.

Oakes also had noticed a change in the elevation of the earth in the northeast corner of the lot, which caused some puddling of water. By a request for repairs dated January 13, 1957, plaintiff John Oakes had noted: ''(1) Combination of settling and incorrect grading caused erosion down side bank (east bank) into neighbor's yard. (2) Lot should have been graded toward street (from rear of house) to allow drainage to street—it isn't graded that way, driveway being higher than dirt blocks drainage to front on 1 side. (3) Large low spot in drive should be patched.''

As early as February 7, 1957, the plaintiffs had observed that the doors to the closets and to the hall of the southeast bedroom were binding and chattering.

The foregoing facts will be supplemented as required when the evidence with reference to some specific point needs to be considered. The procedural facts will be detailed in our seriatim discussion of the procedural errors claimed by both defendants Warren and McCarthy.

WARREN'S APPEAL

We first take up the various assignments of error which Warren urges.

*Warren Owed a Duty of Care to Plaintiffs*

A great deal of Warren's briefs is devoted to its contention that it owed no duty of due care to the plaintiffs upon which liability for negligence can be predicated. It advances this claim upon the theory that it only undertook the rendering of engineering services in the nature of professional advice and opinion; that the duty of due care for this type of service should be confined to those in contract privity with Warren; that to impose liability upon Warren under these circumstances was an extension of liability beyond that theretofore recognized by the courts; that in extending liability into new areas, the court must take into consideration the various sociological factors set forth in *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513] and *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]; and that rejection of its offer of evidence relevant to some of those factors constituted error.

In *Biakanja* the court stated at page 650: ''The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect

the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.''

In this case, however, it is unnecessary to consider such matter which Warren attempts to interject in this appeal.

■ ▪ The nature and extent of the undertaking of Warren in this case was a disputed issue of fact or of mixed fact and law. Was its undertaking confined to just the giving of professional opinion and · advice culminating in its written reports? Or, did it include supervision and inspection of the actual work of cutting, filling, and compaction? The two functions for purposes of liability for negligence fall into separate and distinct categories. Dispute as to whether one is undertaking to render just professional advice or whether he additionally undertakes to supervise the actual work of grading the land is a question of fact. The resolution by the jury is binding where the determination is made upon conflicting evidence. (Cf. *Alexander* v. *Hammarberg* (1951) 103 Cal.App. 2d 872, 876 [230 P.2d 399].)

The issue was put specifically to the jury by the court's instruction No. 2, which read in part:

''One of the issues for your consideration involves the plaintiffs' theory of negligence as against only the Defendant Donald R. Warren Co. and the statute of limitations applicable to such theory. In this connection, you must determine whether the Defendant Donald R. Warren Co. did one or both, of the following: (1) participated in any injury to plaintiffs' property, or (2) rendered services of soils engineering opinions in the practice of a profession.

''To put it another way: Did the Defendant Donald R. Warren Co. control, or have the right to control, the physical activities involving cutting, filling and compacting of the subject real property so that it could be deemed to have participated in injury, if any, to such real property? Or did the Defendant Donald R. Warren Co. only render professional engineering services consisting of the expression of its opinion as a soils engineer based on observations, inspections and tests made by it as to the degree of compaction and bearing capacity of earth fill placed, among other places, on Lot 74 of Tract 21270?

''If you find only the latter of the two propositions to be the fact, then you must return a verdict against the plaintiffs and for the Defendant Donald R. Warren Co. But if you find

otherwise, then you must consider the issues as to the plaintiffs' theory of negligence against defendant Donald R. Warren Co. in accordance with all other applicable instructions.''

■ There was substantial evidence from which the jury could have found that Warren undertook to supervise and inspect the actual work of cutting, filling, and compacting the soil. It had its agent in the field for this purpose. Thompson's contract with McCarthy specifically provided, inter alia, that the work of making fill on the lots was to be prosecuted only in the presence of an engineer or inspector to be supplied by Warren. The field inspector placed on the project by Warren was subsequently discharged, one reason therefor being his failure to make sufficient tests of compaction. It is undisputed that no test for compaction was made on the Oakes' property. The underlying expansive black clay was not removed to rock stratum in the benching operations. The fill on the Oakes' property was not adequately compacted. It failed to conform to the prevailing good soils engineering practice of the time. It left the fill permeable permitting waters to percolate down to the underlying black clay, causing it to expand and slip or creep. This was the proximate cause of plaintiffs' damages. Such conduct constituted actionable negligence (*Massei* v. *Lettunich* (1967) 248 Cal.App.2d 68, 74 [56 Cal.Rptr. 232]) and the protected class is not limited to those in privity of contract with the tortfeasor contractor (cf. *M. Miller Co.* v. *Dames & Moore* (1961) 198 Cal.App.2d 305, 308 [18 Cal.Rptr. 13]).

### Action Not Barred by Statute of Limitations

Warren claims that the plaintiffs' action against it was barred by both sections 339, subdivision 1 (two years) and 338, subdivision 2 (three years) of the Code of Civil Procedure. The two-year limitation period was applicable only if the jury had found Warren's undertaking to have been one of giving professional advice and opinions only. The jury found against Warren on this issue rendering the two-year statute inapplicable.

The pertinent portion of the court's instruction No. 2 reads:

''The defendants have raised defenses that the plaintiffs' action is barred by the statutory periods of limitation, and the defendants have the burden of proving such defenses, except with respect to issues therein as to which you will be otherwise instructed.

"The applicable period of time within which an action for negligent injury to real property must be commenced is three years. The plaintiffs commenced this action on December 20, 1960.

"If you should find that there was negligent injury by any defendant or defendants to plaintiffs' real property, the statutory period applicable thereto commenced to run against the plaintiffs at the time that the acts complained of *first culminated in consequential damage which was appreciable,* and under the evidence presented in this case such time when such damage occurred was not after May 19, 1958. [Italics added.]

"If, in accordance with these instructions, you find that such damage occurred more than three years prior to December 20, 1960, you must return verdicts for all defendants and against plaintiffs as to the theory of negligent injury to real property."

The propriety of this instruction as applied to Warren raises two subsidiary questions: (a) Was a cause of action sufficiently charged against Warren in the original complaint, although it was first served as the Doe II described in plaintiffs' amended complaint, which was not filed until April 4, 1962? (b) Did the three-year statute of limitations commence to run only when the "consequential damage" from the negligence found by the jury became "appreciable"?

While both issues are fraught with some degree of uncertainty, we have concluded that there was no error in the trial court's resolution of these two questions.

a. *The Doe Pleadings.*

Defendant Warren was first served as Doe II of the amended complaint filed April 4, 1962. Warren claims that any negligence cause of action against it was already barred by the statute of limitations when the amended complaint was filed and that there can be no relation back to the original complaint since the charging allegations thereof were not applicable to it. It is true that the allegations as to the Doe defendants in both the original and amended complaints are not free of ambivalence and ambiguity.

The original verified complaint was filed on December 20, 1960. Only McCarthy, the Dunwood Corporation, and Rollingwood were the named defendants. Fifteen Doe defendants were pleaded. Paragraph I alleged that Does One to Ten were partners of Rollingwood. Paragraph II alleged that plaintiffs were not aware of the true names or capacities of Does I

through XV and the Does caused, participated in, and were guilty of the acts and conduct hereinafter complained of which proximately caused injury and damage to plaintiffs. Paragraph VI alleged that defendants so negligently filled, compacted and arranged the Oakes' property and constructed the residence thereon that in March 1958, or thereabouts the property commenced to slip, slide, buckle, and shift, causing damage to the residence and improvements. The complaint further alleged compensatory damages in the amount of $35,000 and included a prayer for future damages.

Only the named defendants, McCarthy, Dunwood Corporation, and Rollingwood, answered the original complaint.

Plaintiffs filed their verified amended complaint on April 4, 1962, labelling it a complaint for declaratory relief and for damages, and setting forth three counts: (1) for fraud, (2) for negligence, and (3) for breach of express and implied warranties.

The first paragraph of the second count sounding in negligence repleaded by reference all of the allegations of the first count, except for the paragraphs charging fraud. Repleaded paragraph II alleged that plaintiffs did not know the true names or capacities of Does I through X, and further averred that such Does claimed some interest in the property and in the judgment to be secured against McCarthy and Does XI to XX, inclusive. Repleaded paragraph III alleged that plaintiffs did not know the true names or capacities of Does XI through XX, and that such Does were the agents and employees of the other named defendants and performed acts pursuant to and within the scope of the agency. Repleaded paragraph IV, however, alleged that Does XI to XX, inclusive, also claimed some interest in the premises, which would be affected by the judgment. Repleaded paragraph VIII averred that McCarthy controlled all other defendants in the subdivision and construction work. Repleaded paragraph XV alleges discovery of the damage in July 1958 and that the cause was a movement of the earth in a northeasterly direction, resulting in $35,000 damages to date and requesting permission to add future damages in conformance with proof. Repleaded paragraph XVII alleged that the defendants had done all of the construction, cutting, filling and compaction of the soil; that plaintiffs were unaware of the precise relation of the defendants to each other and did not know on whom the liability should fall as between the various defendants.

Paragraph II charged the defendants with negligently sub-

dividing, cutting, filling, and compacting the land, and in constructing the residence; that the negligence caused the land to slide in March 1958.

While the portion of paragraph I of the original complaint alleging Does One to Ten as being partners of Rollingwood was not applicable to Warren, the allegations of paragraph II and VI of the original complaint averring that the Does caused, participated in, and were guilty of acts and conduct which proximately caused the damage by negligently filling, compacting, and arranging the real property did apply to and include the defendant Warren.

A similar situation prevails as to the Doe allegations of the first amended complaint. Some allegations did not apply to Warren. However, the following averments did apply: There was a dispute as to the rights and liabilities between the plaintiffs and defendants McCarthy and Does One through Twenty (par. XVI). All of the compaction, filling, cutting and subdivision was done by the defendants; the plaintiffs did not know the exact relationship between the various defendants and did not know the defendant or defendants upon whom the incidence of the liability should fall (par. XVII). The defendants, and each of them, negligently subdivided, cut, filled, and compacted the land causing the land to slide on or about March 1958, to plaintiffs' damage (newly pleaded par. II).

Upon being served as Doe II named in the amended complaint, Warren did not move to quash service of the summons and amended complaint on the ground that it was not Doe II. Nor did Warren demur to the amended complaint on the basis of lack of jurisdiction, ambiguity, uncertainty, or unintelligibility (Code Civ. Proc., § 430, subds. 1, 7, 8, 9). Warren filed an answer affirmatively pleading that the alleged second cause of action for negligence was barred by section 337, subd. 1, section 338, subdivision 2, and section 339, subdivision 1, of the Code of Civil Procedure. In contrast to the answer filed by defendant Thompson, the Warren answer failed to specify that the allegations as to the Doe defendants were defective.

In *Williams* v. *Goodman* (1963) 214 Cal.App.2d 856, 861-862 [29 Cal.Rptr. 877], no facts charging the Doe defendants with liability were pleaded. In contrast, in this case there were allegations in both the original and amended complaints which may be construed as an assertion of a cause of action in negligence against Warren. The inapplicable allegations may be construed as surplusage and would not nullify the force of

the averments which are applicable. (*Austin* v. *Massachusetts Bonding & Ins. Co.* (1961) 56 Cal.2d 596, 602-603 [15 Cal. Rptr. 817, 364 P.2d 681] [allegation that a Doe defendant was a principal, no bar to holding him as a surety] ; cf. *Conolley* v. *Bull* (1968) 258 Cal.App.2d 183, 193-194 [65 Cal.Rptr. 689].)

At the pretrial conference, Warren did contend that at the time the amended complaint was filed, plaintiffs had full knowledge of the true name and capacity of Warren. This is a challenge to the propriety of the Doe allegation in the amended complaint, but not to the Doe allegation of the original complaint. Warren contended that plaintiff John Oakes talked to Warren's soils engineer, William T. Altmeyer, in July or August 1958, after contacting Warren when plaintiff was looking through the yellow pages of the telephone directory for a soils engineer to advise Oakes. At that time, Altmeyer merely informed Oakes that Warren had done some kind of engineering in connection with the tract. In September of 1958, Altmeyer made a visual inspection of the Oakes' property at the plaintiffs' request and prepared a written report, a copy of which was furnished to the plaintiffs. It diagnosed the plaintiffs' problems as being due to a lateral movement of the soil, but it was silent as to the role which Warren played in the original cutting, filling, and compacting processes. In 1961, when the deposition of Cecil F. Collins, vice-president of Warren in charge of its soils engineering activities, was taken by plaintiffs' counsel, plaintiffs were apprised of a copy of a report, dated December 16, 1960, which Warren had made to McCarthy. This report pointed to the causes of the soil slippage, but was silent also as to the activities of Warren in connection with the original cutting, filling, and compacting operations.

The foregoing information was not a bar to plaintiffs' alleging the cause of action against Warren in the Doe form. *Mishalow* v. *Horwald* (1964) 231 Cal.App.2d 517, 521-522 [41 Cal.Rptr. 895], held that even though the identity of a defendant be known, if the plaintiff is ignorant of the basis of liability against such a defendant, the defendant may be held as a party defendant under section 474 of the Code of Civil Procedure. (See also *Johnson* v. *Goodyear Tire & Rubber Co.* (1963) 216 Cal.App.2d 133, 136-139 [30 Cal.Rptr. 650] ; *Larson* v. *Barnett* (1950) 101 Cal.App.2d 282, 289 [225 P.2d 297].) The trial judge impliedly found that the facts imposing liability were unknown to the plaintiffs at the time of

filing their amended complaint despite their knowing Warren's identification as to name only. This factual resolution upon conflicting evidence will not be disturbed by a reviewing court upon appeal.

b. *Statute of Limitations Runs from Time of Noticeable Damage.*

█ The instruction to the jury that the statute of limitations on the negligence theory of recovery would commence to run "at the time the acts complained of first culminated in consequential damage which was appreciable" was essentially correct. In effect, it is a statement that the statute runs from the time that noticeable damage occurs.

█ In general, the statute of limitations does not commence to run until the cause of action accrues. (Code Civ. Proc., § 312,[6] and e.g. *Maguire* v. *Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 733 [146 P.2d 673, 151 A.L.R. 1062]; *Dillon* v. *Board of Pension Comrs.* (1941) 18 Cal.2d 427 [116 P.2d 37, 136 A.L.R. 800].) Authorities which hold that there can be no award of nominal damages for negligent torts point out that without compensable damage there is no cause of action for negligence. (*Fields* v. *Napa Milling Co.* (1958) 164 Cal.App.2d 442, 447-448 [330 P.2d 459, 68 A.L.R.2d 1052]; and see: Prosser on Torts (3d ed., 1964), pp. 146-147; 1 Am. Jur.2d, Actions, § 69, p. 598; 65A C.J.S., Negligence, § 175b, pp. 306-307.) The cases cited by Warren's counsel pertaining to technical injury are not apposite to a negligence cause of action. In negligence cases, the statute of limitations ordinarily does not commence to run until the damage to the plaintiff occurs. (*Merchants Fire Assur. Corp.* v. *Retail Credit Co., Inc.* (1962) 206 Cal.App.2d 55, 58, 59 [23 Cal.Rptr. 544]; *Smith* v. *City of Los Angeles* (1944) 66 Cal.App.2d 562, 586 [153 P.2d 69]; Prosser, *op.cit.,* p. 147; Note, *Developments— Statute of Limitations,* 63 Harv. L. Rev. 1177, 1201 (1950).)

This has been the traditional approach also to cases involving damage to real property caused by removal of lateral support. (E.g. *Veterans' Welfare Board* v. *City of Oakland* (1946) 74 Cal.App.2d 818, 831 [169 P.2d 1000]; *Bellman* v. *County of Contra Costa* (1960) 54 Cal.2d 363, 369 [5 Cal. Rptr. 692, 353 P.2d 300]; *School Dist. No. 15* v. *Kunz* (1946) 249 Wis. 272 [24 N.W.2d 598, 599]; see 1 Am.Jur.2d, Adjoin-

---

[6] "Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute."

ing Landowners, § 69, p. 740; 31 Cal.Jur.2d, Limitation of Actions, pp. 546-547; and Note, *Developments—Statute of Limitations, supra,* 63 Harv. L. Rev. 1177, 1204 (1950).)

A cause of action for consequential damages resulting from an underground trespass does not arise until there is surface damage which would put a reasonable man on notice. (E.g. *Western Coal & Mining Co.* v. *Randolph* (1936) 191 Ark. 1115 [89 S.W.2d 741, 743]; *Lewey* v. *H. C. Frick Coke Co.* (1895) 166 Pa. 536 [31 A. 261, 263, 28 L.R.A. 283].) The rationale of this rule is apposite to this case. ''To require an owner . . . to take notice of a trespass upon his underlying [real property] at the time it takes place, is to require an impossibility; and to hold that the statute begins to run at the date of the trespass is in most cases to take away the remedy of the injured party before he can know that an injury has been done him. A result so absurd and so unjust ought not to be possible.'' (*Lewey* v. *H. C. Frick Coke Co.* (1895) *supra.*)

 In this case, the initial damage caused by the slipping or creeping of the underlying soil resulting from negligent filling, compaction, and inspection was not open to view. Until there was a subsidence or lateral movement causing changes to the surface soil or structures erected thereon, one could not be made aware of defective filling and compaction without running a compaction test, something which Warren undertook to perform but failed to perform on the Oakes' property.

In situations of this kind, reasonable notice is equated to knowledge. (See e.g. *Bathke* v. *Rahn* (1941) 46 Cal.App.2d 694, 696-697 [116 P.2d 640] [malpractice]; *Vertex Inv. Co.* v. *Schwabacher* (1943) 57 Cal.App.2d 406, 415 [134 P.2d 891] [fraud].) Only when the consequential damage is sufficiently appreciable to a reasonable man may we hold an owner to a duty of expeditiously pursuing his remedies. As to when the consequential damage reached this point was a question of fact. (*Schaefer* v. *Berinstein* (1960) 180 Cal.App.2d 107, 129 [4 Cal.Rptr. 236] [overruled on another point, *Jefferson* v. *J. E. French Co.* (1960) 54 Cal.2d 717 at 719-720 [7 Cal.Rptr. 899, 355 P.2d 6433]]; *Tognazzini* v. *Tognazzini* (1954) 125 Cal.App.2d 679, 687 [271 P.2d 77].) And the ultimate issue as to whether the cause of action for negligence was barred by the statute of limitations became a mixed question of law and fact. (*Mitchell* v. *Towne* (1939) 31 Cal.App.2d 259, 261-262 [87 P.2d 908]; *Towle* v. *Sweeney* (1905) 2 Cal.App. 29, 32 [83 P. 74].) It was, therefore, proper to submit the issue to the jury under proper instructions of law.

▉ Since there was substantial evidence supporting the jury's resolution of both these issues of negligence and of the bar of the statute of limitations against Warren, and since the instructions of law pertaining thereto were proper, Warren's motion for judgment notwithstanding the verdict was properly denied. (*Reynolds* v. *Willson* (1958) 51 Cal.2d 94, 99 [331 P.2d 48]; *DeVault* v. *Logan* (1963) 223 Cal.App.2d 802 [36 Cal.Rptr. 145].)

### *No Apportionment of Costs*

▉ The judgment on the verdicts was entered February 14, 1966. The motions of both Warren and McCarthy to tax costs were filed on February 25, 1966, and the order taxing costs in the sum of $3,919.60 was made March 29, 1966. Since this order was made after entry of judgment and is an order separately appealable, it is not reviewable on an appeal from the judgment. (*Hennessy* v. *Superior Court* (1924) 194· Cal. 368, 372 [228 P. 862]; 3 Cal.Jur.2d, Appeal and Error, § 60, p. 496; and see Cal. Civil Appellate Practice (Cont.Ed.Bar 1966) § 5.57, p. 202, and cases there cited.)

But assuming arguendo that it is reviewable, we are unable to change the order of the trial court. Under section 1032 of the Code of Civil Procedure, plaintiffs in an action to recover money damages were entitled to costs as a matter of course. It was not necessary that they recover on all of their various theories or causes of action or counts. (*Cotton* v. *Imperial Valley etc. School Dist.* (1963) 212 Cal.App.2d 879, 881 [28 Cal.Rptr. 438].) The sole basis and measure of recovery of costs is statutory. (*Wilson* v. *Board of Retirement* (1959) 176 Cal.App.2d 320, 322 [1 Cal.Rptr. 373]; *Agnew* v. *Cronin* (1959) 167 Cal.App.2d 154, 157 [334 P.2d 256]; *Heimann* v. *City of Los Angeles* (1949) 91 Cal.App.2d 311, 314 [204 P.2d 955]; *Ridge* v. *Boulder Creek etc. School Dist.* (1943) 60 Cal.App.2d 453, 462 [140 P.2d 990].) There is no statutory authority nor decisional authority, as both Warren and McCarthy concede, which authorizes this court to accede to their request of apportionment. We are aware that if the defendants Rollingwood and its nine partner corporations or if defendant Thompson had advanced the jury fees, the plaintiffs would not have been able to recoup the fees assessed against them from the unsuccessful defendants Warren and McCarthy. (*Gibson* v. *Thrifty Drug Co.* (1959) 173 Cal.App. 2d 554, 556 [343 P.2d 610]; *Davis* v. *Wilde* (1961) 197 Cal. App.2d 855, 856-857 [17 Cal.Rptr. 925].) But under the rule

that costs are statutory and allowable only where authorized by statute, our hands are tied.

*Judgment for Compensatory Damages Joint and Several*

The question whether the judgment for compensatory damages in the amount of $14,825 against defendant McCarthy is a several judgment or joint and several with one for a like amount against Warren was raised by the briefs of the plaintiffs (respondents) and the reply brief of defendant McCarthy. Although it was not a frontal attack, nevertheless the issue is sufficiently brought to our attention so that we cannot ignore the question. To give all parties ample opportunity to argue the issue, we called for supplemental briefs on this point.

Here it would appear that merely the form of the verdicts and judgment is wrong, a matter which properly may be clarified on this appeal (*Aitken* v. *White* (1949) 93 Cal. App.2d 134, 144 [208 P.2d 788]; cf. *Mixon* v. *Riverview Hospital* (1967) 254 Cal.App.2d 364, 375-376 [62 Cal.Rptr. 379]), in order to obviate a separate appeal. In interpreting the judgment, we consider it in the light of the pleadings, evidence, instructions (*Woodcock* v. *Fontana Scaffolding & Equipment Co.* (October 24, 1968) 69 Cal.2d 452 [72 Cal. Rptr. 217, 445 P.2d 881] [Cal. Sup. Ct., S.F. 22605]; *Snodgrass* v. *Hand* (1934) 220 Cal. 446, 448 [31 P.2d 198]) and the verdicts. The pleadings as to negligence consisted of common allegations against both Warren and McCarthy, except for the allegation that McCarthy controlled all other defendants in the subdivision and construction work. Accrued damages claimed to be in the amount of $35,000 are pleaded against both defendants. The evidence as to damages was in conflict and the issue of damages was submitted to the jury on the following instructions pertinent to this issue:

"In a case in which parties suffer damage to their real estate as a proximate result of the negligence of another party or parties, the measure of damages is the amount which will compensate for all of the detriment proximately caused by the negligence of the defendants, whether it would have been anticipated or not. Under the circumstances presented in this case, the measure of damages for negligent injury to real property, if any there be, is the difference between the cost of the property to plaintiffs and the value of the real property at the time of the purchase thereof by plaintiffs. Where appropriate to a particular situation, you may consider the cost of

making repairs on the issue of the value of the property at the time of the purchase and you may also consider present and prospective damages that are the natural, necessary or reasonable incident of the injury to the property. But damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery.''

''If you should find that the plaintiffs are entitled to recover actual damages on any single theory of plaintiffs, whether fraud or negligence, against more than one defendant, you may not allocate the damages between such defendants but must deliver a verdict in one single sum against all defendants whom you find so liable for actual damages; with respect to punitive damages, as against The McCarthy Company, Rollingwood Estates and the corporate partners therein, however, you may find a different amount of damages against each such defendant you find liable on the plaintiffs' fraud theory, depending on the degree of guilt you attribute to said defendant.''

As to compensatory damages for fraud, the court instructed: ''In connection with plaintiffs' theory of fraud as against The McCarthy Company, Rollingwood Estates Company and the corporate partners therein, one defrauded in the purchase of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the value of that which he received, and, in addition thereto, is entitled to recover such additional damages as arise from the particular transaction, which include expenditures made by the defrauded person which were reasonable under the circumstances, to the extent that they have been lost or rendered fruitless because of the deceit. A defrauded person should be given his actual out-of-pocket loss, and where necessary to reach that result, circumstances subsequent to the time of purchase may be considered.''

On the fraud theory of action, the jury returned a directed verdict in favor of Warren. The other three verdicts against Warren and McCarthy read:

''We, the jury in the above entitled action, find for the plaintiffs, John C. Oakes and Grace Oakes, and against the defendant. Donald R. Warren Co., a copropation [sic], and assess damages in the sum of $14825.00.''

''We, the jury in the above entitled action, find for the plaintiffs, John C. Oakes and Grace Oakes, and against the defendant, The McCarthy Company, a corporation, and damages in the sum of $14825.00.''

"We, the jury in the above entitled action, find for the plaintiffs, John C. Oakes and Grace Oakes, and against the defendant, The McCarthy Company, a corporation, and assess punitive damages in the sum of $77500.00."

By the jury's reply to special interrogatories, we are apprised that recovery against Warren was based on negligence alone while the recovery against McCarthy was based both upon negligence and fraud. The judgment entered upon the verdicts as it relates to the defendants Warren and McCarthy reads:

"It is further ordered, adjudged and decreed tha[t] the plaintiffs John C. Oakes and Grace Oakes have and recover from the defendant, Donald R. Warren Co., a corporation, the sum of $14,825.00. . . .

"It is further ordered, adjudged and decreed that the plaintiffs, John C. Oakes and Grace Oakes have and recover from the defendant, The McCarthy Company, a corporation, the sum of $14,825.00 together with the sum of $77,500.00 punitive damages. . . ."

No objection to the forms of the verdict or of ⁺′ judgment was registered until the difference in opinion b ⁿn the plaintiffs and McCarthy appeared in the briefs. An. ⁿsel conceded at oral argument that no issue is before us as to whether the instructions as to the measure of damages as contrasted to the amounts awarded were proper. Basically the instructions as given on compensatory damages for both negligence and fraud established one common rule. Negligence was the theory of recovery common to both verdicts on compensatory damages. █ It is established that where the negligence between two or more defendants is incapable of logical segregation or apportionment each tortfeasor is liable jointly and severally with the others for the total amount of compensatory damages. (*Dauenhauer* v. *Sullivan* (1963) 215 Cal. App.2d 231, 235-237 [30 Cal.Rptr. 71]; *Puckett* v. *Sullivan* (1961) 190 Cal.App.2d 489, 495-496 [12 Cal.Rptr. 55, 87 A.L.R.2d 704]; cf. *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 433-434 [218 P.2d 17]; *Apodaca* v. *Haworth* (1962) 206 Cal.App.2d 209, 213-214 [23 Cal.Rptr. 461]; *Hallinan* v. *Prindle* (1934) 220 Cal. 46, 54-56 [29 P.2d 202].)

█ The jury were correctly instructed that if they found plaintiffs were "entitled to recover actual damages on any single theory of plaintiffs, whether fraud or negligence, against more than one defendant, you may not allocate the damages between such defendants but must deliver a verdict

in one single sum against all defendants whom you find so liable.'' Despite the several verdicts, a single joint and several judgment for compensatory damages should have been entered. (*Weddle* v. *Loges* (1942) 52 Cal.App.2d 115, 119-120 [125 P.2d 914] ; *Phipps* v. *Superior Court* (1939) 32 Cal.App. 2d 371, 375-378 [89 P.2d 698] ; *Bradford* v. *Brock* (1934) 140 Cal.App. 47 [34 P.2d 1048].) The rule is otherwise as to punitive damages. (*Thomson* v. *Catalina* (1928) 205 Cal. 402 [271 P. 198, 62 A..L.R. 235].)

The proper result can be attained in this case by adding to the judgment the following: ''The amount of plaintiffs' recovery for compensatory damages shall not in any event exceed the total principal sum of $14,825.00, whether the sum be recovered from either or both of the defendants, The McCarthy Company, a corporation, and the Donald R. Warren Co., a corporation.''

## THE McCARTHY APPEAL
### *Liability for Fraud*

McCarthy claims that the evidence is insufficient to support the verdict against it for fraud. Specifically, the plaintiffs rested their fraud action on: (1) fraudulent nondisclosure of (a) the property being on filled ground, and (b) the drainage being towards the rear of the lot and without proper drainage swales; and (2) affirmative misrepresentations that (a) the work on the premises was done in good workmanlike manner, and (b) that the house was constructed in compliance with FHA requirements and that inspection by the FHA inspectors was plaintiffs' assurance of proper grading of the lot area. Allegations to encompass (2) (b) were added to the fraud count by a motion to conform the pleadings to proof, the granting of which McCarthy claims to have been error. We deal with the pleading question later.

As to the claim of insufficiency of the evidence, it is basic law that '' (1) When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of the appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support a finding of fact. [Citations.] (2) When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the [trier of fact].'' *Primm* v. *Primm* (1956) 46 Cal.2d 690, 693-694 [299 P.2d 231].) The same rule applies to fraud cases. (*Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 422 [159

P.2d 958].) Furthermore, plaintiffs need not prove all of the concealments or misrepresentations pleaded. It is adequate that the evidence supports one material fraudulent concealment or misrepresentation of fact. (23 Cal.Jur.2d, Fraud and Deceit. § 83, pp. 210-211, and cases cited.) Either a concealment of the land being on filled ground or an affirmative misrepresentation that the FHA conducted inspections and that such inspections were an assurance that the land was properly graded could constitute the necessary fraud. (Cf. *Massei* v. *Lettunich* (1967) *supra,* 248 Cal.App.2d 68, 72-73.) The evidence supports a finding of fraud upon either or both of these grounds. ''An independent investigation or an examination of property does not preclude reliance on representations where the falsity of the statement is not apparent from an inspection, or the person making the representations has a superior knowledge, or the party relying thereon is not competent to judge the facts without expert assistance.'' (*Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 748 [192 P.2d 935]; accord *Hobart* v. *Hobart Estate Co.* (1945) *supra,* 26 Cal.2d 412, 435.)

 The claim of concealment of the drainage to the rear need not detain us. Plaintiffs signed an agreement on September 7, 1956, entitled, ''Slope and Drainage Agreement on Lot Draining to Rear.''

An intent to conceal the fill may be inferred from the sales personnel being instructed to tell the prospective purchasers about the filled ground if inquiry were made, but to remain silent in the absence of customer inquiry. The fact that plaintiffs made no inquiry as to the ground being filled is undisputed. Nor is the fact that the sales personnel did not inform plaintiffs of the existence of the fill contradicted. Whether just looking at the tract area constituted notice of possible fills was a jury question. However, even assuming simple negligence on plaintiffs' part in failing to make inquiry, simple negligence is no bar to recovery based upon intentional concealment. (*Hobart* v. *Hobart Estate Co.* (1945) *supra,* 26 Cal. 2d 412, 437.)

 As to the representation of good workmanship in the grading and that FHA inspection was an assurance of the lot being properly graded, the plaintiff John Oakes testified that it was conveyed to him by the original advertisement in the Los Angeles Times and a facsimile of the Certificate of Guaranty displayed on the wall of the sales office. The certificate read in part: ''This house was constructed under Los Angeles

County Building Code and Federal Housing Administration and Veterans Administration construction requirements. It was inspected by County and FHA inspectors. These inspectors are your assurance that this building has been properly constructed, and all the lot area properly graded.'' The FHA clearance of the Oakes' property was not obtained until three days after plaintiffs had gone into occupancy. If the written guaranty were the sole representation in this respect, then the question of reliance upon the contents thereof might arise. However, the document also served as corroboration of oral assurances made to plaintiffs. It surely was an instrument lulling the plaintiffs into a sense of security.

Amendment of the complaint after plaintiffs had rested their case in chief was within the discretion of the trial court. The crucial portion of the amendment was that which in essence repeated the language of the first paragraph of the Certificate of Guaranty. The court had admitted the certificate not only on the warranty count, but also on the fraud count. There was no attempt to add a new cause of action; the amendment was only an elaboration upon the representation of good workmanship which had been previously pleaded. (*Jaffe* v. *Heffner* (1959) 173 Cal.App.2d 512, 517 [343 P.2d 374]; *Von Schrader* v. *Milton* (1929) 96 Cal.App. 192, 202 [273 P. 1074].) Upon defendants claiming surprise, the court granted them a continuance of the trial for one week to enable them to take the depositions of the plaintiffs upon this matter. Absent an abuse of discretion causing prejudice to the party opposing the amendment, amendments are to be allowed with liberality. (*Trafton* v. *Youngblood* (1968) 69 Cal.2d 17, 30-31 [69 Cal.Rptr. 568, 442 P.2d 648].)

### Punitive Damages

The jury awarded $77,500 punitive damages against McCarthy. Upon McCarthy's motion for new trial, the trial judge reduced the amount to $59,300. McCarthy contends that there is no evidentiary support for this punitive award and that in any event the amount is excessive as a matter of law.

McCarthy asserts that an intent to cheat the plaintiffs must be found before punitive damages may be awarded. Section 3294 of the Civil Code provides: ''In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.'' The words, ''oppression,

fraud, or malice" are in the *disjunctive* and any of them may be "express or implied." Fraud alone is an adequate basis for awarding punitive damages. (*Spencer* v. *Harmon Enterprises, Inc.* (1965) 234 Cal.App.2d 614, 626 [44 Cal.Rptr. 683]; *Batc* v. *Marsteller* (1965) 232 Cal.App.2d 605, 620 [43 Cal.Rptr. 149]; *Austin* v. *Duggan* (1958) 162 Cal.App.2d 580, 584 [328 P.2d 224]; *Lawson* v. *Town & Country Shops, Inc.* (1958) 159 Cal.App.2d 196, 204 [323 P.2d 843].) We have already pointed out that the jury finding of fraud is supported by the record.

 "The reviewing court's power to declare an award of damages excessive exists only when from the facts the amount appears at first blush to suggest passion or prejudice on the part of the jury. There is no distinction when the review is of an award of exemplary rather than actual damages. . . . [I]t is the province of the jury, and the trial court on the motion for a new trial, to say whether punitive damages should be awarded. The presumptions are in favor of the correctness of the verdict and judgment. After an award has been approved by the trial court the reviewing court will hesitate to declare the amount excessive unless upon consideration of the entire record including the evidence it must be said that the award was the result of passion or prejudice." (*Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19].)

 "And while exemplary damages should bear a reasonable relation to the actual damages, there is no fixed ratio by which to determine the proper proportion between compensatory and exemplary damages." (*Austin* v. *Duggan* (1958) *supra,* 162 Cal.App.2d 580, 584.)

The examples are many, where the award of punitive damages in excess of the compensatory damages has been upheld upon review. In *DiGiorgio Fruit Corp.* v. *AFL-CIO* (1963) 215 Cal.App.2d 560, 579-581 [30 Cal.Rptr. 350], the appellate court reduced the compensatory damages from $100,000 to $10,000, but left untouched the award for $50,000 punitive damages. In *Drouet* v. *Moulton* (1966) 245 Cal.App.2d 667, 670, 673 [54 Cal.Rptr. 278], an award for $2,500 compensatory and $5,000 punitive damages was upheld. In *Gruner* v. *Barber* (1962) 207 Cal.App.2d 54, 55, 59 [24 Cal.Rptr. 292], punitive damages for $1,500 in face of an award of only $650 for compensatory damages was sustained. In *Austin* v. *Duggan* (1958) *supra,* 162 Cal.App.2d 580, 582, 584, the amounts

awarded were $740.54 for compensatory and $1,500 for punitive damages.

Assuming that the amount of $77,500 was the product of passion and prejudice, the trial judge brought the sum down within the realm of reason by reducing the amount to $59,300. One important factor in determining the propriety of an award for punitive damages is the wealth of the tortfeasor. Here, the net worth of McCarthy at the time of trial was shown to be $2,216,911.20. While the award was on the high side, it was not beyond the pale of reason.

Objection was raised that no definite amount of punitive damages had been prayed for in either the original or the amended complaint. But where the body of the complaint sets forth facts upon which an award of punitive damages may be predicated, even the complete absence of a prayer constitutes no obstacle to an award of punitive damages. (*Rogers* v. *Kabakoff* (1947) 81 Cal.App.2d 487, 491-492 [184 P.2d 312]; *Turner* v. *Whittel* (1934) 2 Cal.App.2d 585, 590 [38 P.2d 835].) This is especially true where the case is contested and evidence bearing upon the issue has been received. (*Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 606 [191 P.2d 432]; see 1 Chadbourn et al., Cal. Pleading (1961) § 936, p. 912.) No legal basis has been presented for disturbing the trial judge's determination as to the proper amount of punitive damages in this case.

### No Error in Granting a Jury Trial

McCarthy contends that plaintiffs had waived their right to a jury trial by virtue of their original counsel failing to demand a jury trial in the "Memorandum for Setting Contested Action" filed on February 8, 1961. At that time, neither defendant Warren nor defendant Thompson had been served with a summons and complaint. The pretrial conference set for September 26. 1961, pursuant to the above memorandum for setting, was taken off calendar by stipulation of plaintiffs' then counsel and McCarthy's counsel. Thereafter on April 4, 1962, the amended complaint was filed and Warren and Thompson were brought into the case. The court on November 23, 1965, set the case down for trial on December 14, 1965. This was the time "the cause [was] first set upon the trial calendar" within the meaning of subdivision 4, section 631, of the Code of Civil Procedure. (*Mutual Bldg. & Loan Assn.* v. *Corum* (1934) 220 Cal. 282, 285-291 [30 P.2d 509, 513]; *DeCastro* v. *Rowe* (1963) 223 Cal.App.2d 547, 555-556 [36 Cal.Rptr. 53].) At the pretrial conference held on

that date, both the plaintiffs and Thompson demanded a jury trial. Thompson did not join the motion of McCarthy and Warren on the date of trial that plaintiffs had waived their right to a jury trial. The portion of the action sounding in the declaratory relief aspect of the case was not being pressed by plaintiffs. We find that there was no waiver of jury trial under the foregoing circumstances.

It is settled that in case of doubt, the issue should be resolved in favor of preserving a litigant's constitutional right to a trial by jury. (*Hernandez* v. *Wilson* (1961) 193 Cal.App.2d 615, 619 [14 Cal.Rptr. 585]; *Cowlin* v. *Pringle* (1941) 46 Cal.App.2d 472, 476 [116 P.2d 109].) In any event, Thompson had a right to a jury trial. McCarthy asked for no severance of Thompson's trial from that between plaintiffs and McCarthy.

Even in cases where there has been a waiver, section 631 of the Code of Civil Procedure provides, "The court may, in its discretion upon such terms as may be just, allow a trial by jury to be had although there has been a waiver of such a trial." The trial court's statement that it had this discretionary power to grant a jury trial in any event was a correct statement of the law. (*Hernandez* v. *Wilson* (1961) *supra,* 193 Cal.App.2d 615, 618-619; *Johnson* v. *Western Air Express Corp.* (1941) 45 Cal.App.2d 614, 624-625 [114 P.2d 688].)

There is no presumption that prejudice results merely because the case is tried to a jury. (*Johnson* v. *Western Air Express Corp., supra*; *Duran* v. *Pickwick Stages System* (1934) 140 Cal.App. 103, 109 [35 P.2d 148].) From the record before us, we doubt if McCarthy would have obtained any more favorable result had the cause been tried to a court instead of a jury. The request for jury trial in this case was no sudden request for reinstatement of a jury trial on the very morning of trial. McCarthy could not claim surprise on this score and no showing has been made wherein McCarthy was prejudiced.

### Earth Movement on Adjoining Lots Admissible

McCarthy asserts that it was error in permitting their expert witness to be cross-examined on his knowledge of the fact that there had also been an earth movement on Lots 72 and 73 of Tract 21270, as well as on plaintiffs' Lot 74. One of the defenses pleaded by McCarthy was that the "plaintiffs were guilty of contributory negligence with respect to the purchase, improvement and maintenance of the said real

property . . . which proximately caused the damages of which plaintiffs complain.'' The fact that the adjoining lots also slid, creeped, or moved is relevant evidence on this issue. It tends to show that the movement or creeping was due to causes other than plaintiffs' conduct or omission and hence was properly admitted.

### *McCarthy's Requests for Special Jury Findings*

McCarthy urges that the trial court erred in refusing to submit the following questions requested by McCarthy to the jury: ''(1) Did the plaintiffs learn that their lot drained to the rear when they moved into their home on or about September 7, 1956? (2) Were plaintiffs aware that their lot drained to the rear when they signed the Request for Repairs on January 13, 1957? (3) Could plaintiffs have reasonably learned of the existence of fill upon Lot 74 at any time prior to September 7, 1956, by visual inspection of the property or otherwise? (4) Did THE McCARTHY COMPANY at any time represent to plaintiffs that the home on Lot 74 had been built in accordance with Los Angeles County Building Code requirements and F.H.A. requirements, and that the lot area had been properly graded? (6) Was the residence on Lot 74 constructed in accordance with Los Angeles County Building Code requirements and F.H.A. requirements? . . . (14) If THE McCARTHY COMPANY misrepresented any facts to plaintiffs or concealed any material facts from the plaintiffs, did it do so with the intent to cheat the plaintiffs?''

As noted above, questions (1) and (2) are immaterial to the final determination of this case. Question (6) concerning the construction of the residence is separate and apart from the proper grading and compaction of the underlying earth. The general verdict, construed together with the special interrogatories submitted, manifests that questions (3) and (4) were answered ''no'' and ''yes,'' respectively. Question (14) did not pose a factor indispensable to an award of punitive damages.

Moreover, whether requests for special findings shall be submitted to the jury lies within the discretion of the trial judge. (*George* v. *Los Angeles Ry. Co.* (1899) 126 Cal. 357, 365 [58 P. 819, 77 Am.St.Rep. 184, 46 L.R.A. 829]; *Sloan* v. *Stearns* (1955) 137 Cal.App.2d 289, 302-303 [290 P.2d 382].) Absent a showing of a clear abuse of discretion, the trial judge's determination upon this issue is not subject to review. (*Cembrook* v. *Sterling Drug Inc.* (1964) 231 Cal.App.2d 52, 64 [33 Cal.Rptr. 511]; *Perry* v. *Schwartz* (1963) 219 Cal.App.2d

825, 828 [33 Cal.Rptr. 511] ; *House Grain Co.* v. *Finerman & Sons* (1953) 116 Cal.App.2d 485, 498 [253 P.2d 1034].)

 The trial court submitted special interrogatories of its own to the jury. They were: ''(1) Did you reach a verdict for the plaintiffs, and against defendants, The McCarthy Company . . . based on the theory, or cause of action, for negligence?'' (2) ''Did you reach a verdict for the plaintiffs and against any defendant or defendants based on the theory, or cause of action, for fraud?'' (3) ''If the answer to the above interrogatory number (2) is YES, state the name or names of those defendants against whom you reached such a verdict on the theory, or cause of action for fraud.'' The jury answered both interrogatories (1) and (2) ''Yes.'' and in reply to interrogatory (3) wrote ''The McCarthy Company.''

The trial judge considered these interrogatories adequate to ascertain the bases for the general verdicts. McCarthy acknowledges the rules of law enunciated in the foregoing cases and frankly concedes that it has been unable to find any case wherein the trial judge was held to have abused his discretion. We find no abuse of discretion here.

## Other Contentions

To the issue of negligence, McCarthy has raised only the statute of limitations defense, which we have answered in connection with defendant Warren's appeal. An owner-builder who negligently builds on improperly compacted filled ground may be held liable. (*Sabella* v. *Wisler* (1963) 59 Cal. 2d 21, 27-30 [27 Cal.Rptr. 689, 377 P.2d 889] ; *Conolley* v. *Bull* (1968) *supra,* 258 Cal.App.2d 183, 197.) An owner who resells such property has been held to the same liability as that of a contractor. (*Sweeney* v. *Stone* (1968) 265 Cal. App.2d 693, 695 [71 Cal.Rptr. 497].)

The nonapportionment of the costs and the judgment for compensatory damages being joint and several have been considered in connection with Warren's appeal.

## Disposition

While defendant McCarthy made a motion for judgment notwithstanding the verdict, as well as a motion for new trial, its appeal was limited to an appeal from the judgment as modified by the order of April 15, 1966.

The judgment as to both defendants, The McCarthy Company, a corporation, and the Donald R. Warren Co., a corporation, is modified by adding the words: ''The amount of recovery for compensatory damages shall not in any event

exceed as to its total principal sum, the amount of $14,825.00, whether said sum be recovered from either or both of said defendants, The McCarthy Company, a corporation, and the Donald R. Warren Co., a corporation.'' As so modified, the judgment is affirmed; the order denying defendant Donald R. Warren Co.'s motion for judgment notwithstanding the verdict is affirmed. Respondents (plaintiffs) shall recover their costs on this appeal.

Jefferson, Acting P. J., and Kingsley, J., concurred.

Petitions for a rehearing were denied November 26, 1968, and appellants' petitions for a hearing by the Supreme Court were denied December 30, 1968.