651 F.2d 458
 Fed. Sec. L. Rep. P 97,841
Robert Edward McGRATH, Plaintiff-Appellee,
v.
ZENITH RADIO CORPORATION, Zenith Distributing Corporation of
Northern California, Walter C. Fisher and Amile J.
Forni, Defendants-Appellants.
 No. 79-1361.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 13, 1980.
Decided Jan. 28, 1981.
As Modified May 20, 1981.
 
 Henry L. Pitts, James G. McConnell, Chicago, Ill., for defendants-appellants.
 D. Kendall Griffith, Chicago, Ill., for plaintiff-appellee.
 Before FAIRCHILD, Chief Judge, and SWYGERT and CUMMINGS, Circuit Judges.
 FAIRCHILD, Chief Judge.
 
 
 1
 This case arises out of the July 1972 acquisition by Zenith Radio Corporation (Zenith or Zenith Radio) of the H. R. Basford Company (Basford), an electronic products wholesaler, and the November 1972 firing of plaintiff, Robert E. McGrath, Basford's vice-president. Alleging breach of contract, fraud, and violations of the securities laws, McGrath argued in the district court that his termination was wrongful because defendants had failed to fulfill a promise to appoint him president of the Zenith subsidiary upon the retirement of the then-current top executive. A six-person jury returned a verdict in plaintiff's favor for one million dollars in compensatory damages against all defendants and, in addition, returned separate verdicts against each defendant for punitive damages totaling another million dollars. On appeal to this court, defendants claim primarily that the evidence was insufficient under each of the three counts and that the respective measures of damages were inappropriate. While we reject the challenge to the sufficiency of the evidence and find certain alleged errors not preserved for appellate review, we conclude that since there was no testimony as to how long it was probable that McGrath would continue as president of the subsidiary or would occupy a similar position with another company, the jury's award of compensatory damages for loss of future earnings was in part speculative. Plaintiff shall therefore have the option of accepting $1,300,000 in damages ($300,000 compensatory, $1,000,000 punitive) or submitting to a new trial on the question of damages only.
 
 Facts
 
 2
 The defendants in this case are two corporations, Zenith and its subsidiary, Zenith Distributing of Northern California (Zenith Distributing), and two individuals, Amile J. Forni and Walter C. Fisher.
 
 
 3
 H. R. Basford Company was a California corporation which distributed Zenith products in the San Francisco area. In August 1971, McGrath was hired by Forni, the president of Basford, to assume the position of vice-president and general manager. It was the intention of both parties that Forni would soon retire and that McGrath would succeed to the company's presidency. In addition to an annual salary of $35,000 as vice-president, McGrath was given the option of purchasing 5,000 shares of Basford stock, provided that he was still working for Basford in three years and that the California Commissioner of Corporations would approve the sale. In September and October, 1971, McGrath bought 2,835 shares of Basford stock.
 
 
 4
 In February 1972, representatives of Zenith Radio and Basford began discussing the possibility of expanding Basford's market for Zenith products. Following a series of meetings in April, May, and June of 1972 it was agreed that this expansion could best be handled by Zenith's acquisition of Basford. At these meetings, McGrath was the main spokesman for Basford. His chief concern was that Basford employees would retain their job security and that Basford shareholders, all of whom were employees, would receive a fair price for their shares. Zenith's primary demand was that it be assured of acquiring all of Basford's stock, for it wanted no minority shareholders.
 
 
 5
 On June 2, 1972, a tentative agreement was reached, and on July 12, 1972, the terms of the proposed sale were disclosed to Basford employees and shareholders. Fisher, a representative of Zenith, assured the employees that their jobs were secure and that career opportunities would probably be enhanced as a result of the acquisition.
 
 
 6
 Also on July 12, 1972, Fisher, Forni, and Paul Dwyer, Zenith's treasurer, concluded that because of Zenith's desire to acquire all of Basford's stock, it was necessary to extinguish the option agreement which gave McGrath the right to purchase additional shares. The following day Fisher met with McGrath and asked him to waive the option. McGrath testified that at that meeting:
 
 
 7
 "Mr. Fisher ... indicated to me that, you know, we have to dispose we have to in some way eliminate this option to buy shares. I said 'Yes, I knew that.'
 
 
 8
 "He then told me that there was nobody more hurt in the sale of the company, or nobody gave up more in the sale of the company than I was giving up if I was going to waive the option to buy the shares. He explained that it deprived me of potential profit on those shares.
 
 
 9
 "He then told me that as far as he understood that I would be heir apparent to Mr. Forni upon his retirement and that was thoroughly acceptable to both Zenith and to himself.
 
 
 10
 "He said that as the president of the new corporation I would be entitled to substantial stock options at the Zenith Radio Company and be a part of a group which was referred to as an executive compensation bonus compensation group, which he explained was in the area of 110 to 120 people of senior executives at Zenith who participated in a yearly extra compensation or bonus program.
 
 
 11
 "He then presented me with a waiver ... for the right of my purchase of those shares of stock. I said, 'Walter (Fisher), I do think I gave up more than anybody else in this company by the sale, and I would like to have a three-year employment contract with the H. R. Basford Co. under your ownership.'
 
 
 12
 "Walter said that it was not the practice at Zenith Radio Corporation to have employment contracts with any of their executives, including himself, and that Zenith Radio Corporation did not have a reputation of mistrusting or (mis) handling people, and that it would have to be that there would be no contract, but we certainly understood that I was the heir apparent and I was to benefit from the programs that he had outlined.
 
 
 13
 "I indicated to him that I was then trusting him as being the person who had represented to me my future status and standing with the Zenith Radio Corporation, and I signed the waiver...."
 
 
 14
 In exchange for signing the waiver, McGrath received nothing of value other than the knowledge that it facilitated the sale to Zenith.
 
 
 15
 Immediately after this conference, Fisher went to Forni's office and was advised that Forni had doubts about the job McGrath was doing and whether he would make a suitable successor. His reasons for unhappiness with McGrath included the latter's failure to get out and meet the dealers who were Basford's customers, his time-consuming outside activities, and his poor judgment in handling particular problems. Forni and Fisher discussed these shortcomings and Forni agreed to wait three or four months before making any definite decision. After this meeting, Fisher rode downtown with McGrath but made no mention of the conversation. When McGrath asked how soon he was going to be made president, Fisher said he still had some things to discuss with Forni and appeared more aloof and uncertain than at their earlier meeting. The next day when McGrath asked Forni whether he and Fisher had spoken regarding McGrath's ascendancy to the presidency, Forni said "no."
 
 
 16
 On July 14, 1972, the Basford stockholders, including McGrath, signed the documents by which they agreed to sell their shares of stock to Zenith.
 
 
 17
 At no time prior to the closing did McGrath have any reason to believe Forni had reservations about his becoming president upon Forni's retirement. Despite two or three phone conversations with Fisher between July 13 and the closing on July 31, Fisher did not disclose Forni's misgivings about McGrath.
 
 
 18
 On October 6, 1972, Forni met with Fisher in Chicago and recommended that McGrath be replaced. Fisher agreed after much conversation. When McGrath asked Forni about his meeting of October 6 with Fisher, Forni said that the subject of McGrath's future did not come up.
 
 
 19
 On Sunday, November 12, 1972, at 10:00 or 11:00 at night, Forni telephoned McGrath to tell him that he was fired effective January 1, 1973, with pay to continue until the end of March 1973. McGrath's attempts to effectuate a reconciliation failed and despite his requests that he be permitted to save face by taking a different job in the Zenith organization, even on a temporary basis, no such opportunity was made available to him. McGrath immediately began to search for new employment but was refused further use of an office, telephone, or secretarial help to aid him in the preparation of resumes and letters to be sent to potential employers. As a result of four months of searching and interviewing, he received three job offers and accepted one with the Fleetwood Corporation of Montreal, Canada, in April 1973. The Fleetwood position paid $36,000 annually and had a bonus potential of approximately another $6,000.
 
 Jurisdiction
 
 20
 Before turning to the merits of this case, we will address defendants' contention that the district court was without jurisdiction to hear McGrath's claims. Jurisdiction was based on 28 U.S.C. § 1331(a),[1] the general federal question jurisdictional statute, and on the doctrine of pendent jurisdiction. Defendants argue that this is an ordinary employer-employee dispute involving state law, and that McGrath's charge of securities fraud is a contrived attempt to establish federal question jurisdiction which follows his unsuccessful effort to establish diversity jurisdiction. We disagree.
 
 
 21
 It is settled that if the complaint sets forth a substantial claim, a case is presented within the federal jurisdiction. See Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); Hagans v. Levine, 415 U.S. 528, 536-543, 94 S.Ct. 1372, 1378-1382, 39 L.Ed.2d 577 (1973). To be substantial, the claim need only be not "obviously frivolous," "obviously without merit," or "essentially fictitious." Hagans, supra, 415 U.S. at 537, 94 S.Ct. at 1379, and cases cited therein. McGrath alleged in his complaint that he suffered losses as a result of misrepresentations concerning his future employment made by defendants in connection with Zenith's acquisition of his Basford shares and the waiver of his option as a result, that is, of the defendants' violation of the federal securities laws. None of the issues factual or legal raised by this charge is so obviously foreclosed by previous decisions of the Supreme Court or other courts that there is "no room for the inference that the questions sought to be raised can be the subject of controversy." Levering, supra, 289 U.S. at 105-106, 53 S.Ct. at 550. We hold, therefore, that this case presents a substantial federal question and the district court properly exercised jurisdiction in hearing it.
 
 
 22
 Defendants also argue that the district court abused its discretion in agreeing to hear the pendent state claims involved in this case. The doctrine of pendent jurisdiction rests on considerations of judicial economy, convenience, and fairness to litigants. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Defendants do not deny that the exercise of pendent jurisdiction here would serve judicial economy and convenience, and, certainly, the federal and state claims in this case all arise out of a "common nucleus of operative fact." Gibbs, supra, 383 U.S. at 725, 86 S.Ct. at 1138. The defendants' asserted liability, under both federal and state law, rests on the same set of events, and proof would require largely the same evidence. Defendants argue instead that pendent jurisdiction should not have been exercised because the six-member jury was too small to render a fair verdict. This claim is completely without merit. The Supreme Court, in Colgrove v. Batten, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), ruled that a six-member panel does not violate the Seventh Amendment right to a civil jury. A federal court which deems a jury of six adequate should hardly decline otherwise proper pendent jurisdiction because a jury of twelve might be better. We hold that all aspects of this case were properly before the district court.
 
 
 23
 Turning now to the merits of this appeal, we observe first that defendants' burden is a heavy one in seeking reversal of the judgment or remand for a new trial. The case was submitted to the jury on three theories of liability breach of contract, common law fraud, and violation of the securities laws but the verdict in favor of plaintiff did not specify under which theory or theories liability for compensatory damages was imposed. Accordingly, to triumph on appeal, defendants must show that under none of the three rationales was plaintiff entitled to the award of compensatory and punitive damages.
 
 The Breach Of Contract Claim
 
 24
 The contract upon which McGrath's claim of breach was predicated was the oral agreement between McGrath and Zenith Radio and Zenith Distributing (Basford's successor), negotiated by their agent, Fisher, on July 13, 1972. Defendants contend on appeal that even assuming arguendo that an agreement may have been entered into on that occasion, no actionable breach has been proven because the contract was only one for employment at will, and as such was terminable by either party at any time. For support, defendants point to McGrath's own testimony that he asked for but was refused a three-year written contract and to the absence of any other evidence as to the contemplated duration of plaintiff's prospective employment.
 
 
 25
 The difficulty with this line of reasoning is that it misconstrues the nature of plaintiff's argument. McGrath does not assert merely that Zenith promised to continue his employment, but rather that Zenith promised to make him president of Basford's successor upon the retirement of Forni and to afford him career opportunities and benefits, including stock options in Zenith and participation in an executive bonus compensation group. In exchange for these promises, according to plaintiff, he agreed to sell his stock and to waive the option he had to purchase shares in Basford. The alleged wrong lay in defendants' failure to either establish cause for not making him president or to make him president and then ease him out after a decent interval.
 
 
 26
 We believe that the evidence produced at trial including McGrath's testimony that Fisher told McGrath that his becoming president was "thoroughly acceptable to both Zenith and himself"; "that as president ... (McGrath) would be entitled to substantial stock options and ... (to participate in) an executive ... bonus program"; and "that (McGrath) was the heir apparent" formed a sufficient basis on which the jury could conclude that Zenith had promised to appoint plaintiff president of the new corporation and that a binding contract had been entered. While there was no representation that McGrath would be president for any specified tenure, the jury could find from the evidence a promise that McGrath would be made president with a reasonable opportunity to give satisfactory performance. As the finder of fact, the jury was entitled to conclude that the agreement, although performed by McGrath by his selling his shares and executing the waiver, was breached by defendants when they terminated his employment.
 
 
 27
 Contrary to defendants' assertions, the contract was not terminable at will because under California law, which is the law applicable to this case, even where a contract is for employment for an indefinite period, the "terminable at will" doctrine is inoperative if the contract is based on consideration other than the services to be rendered. Speegle v. Board of Fire Underwriters, 29 Cal.2d 34, 39, 172 P.2d 867, 870 (1946); Brawthen v. H & R Block, Inc., 52 Cal.App.3d 139, 149, 124 Cal.Rptr. 845, 851 (1975). Plaintiff here agreed not only to work for Zenith but to surrender his stock purchase option and sell his stock.
 
 
 28
 Nor do we find merit to defendants' suggestion that the oral contract was barred by the parole evidence rule. The terms of the sale agreement of July 14, 1972, which was signed by McGrath and the other shareholders, are not contradicted or modified by proof of the earlier oral agreement of July 13. The written agreement contained no provisions concerning who would be the officers of the successor corporation or the fringe benefits to be enjoyed by such officers. In contrast, the main subject matter of the oral agreement between Zenith and McGrath was the presidency of the successor corporation and the fringe benefits that officer would receive. While section 9(2) of the July 14 agreement provided that "since December 31, 1971 ... there has not been ... (vi) any employment, bonus or deferred compensation agreement entered into between THE CORPORATION (Basford) and any of its directors, officers, shareholders or other employees or consultants ..." this representation related only to agreements by Basford, not by Zenith. Consequently, it is not contradicted by proof of the oral contract with McGrath.
 
 
 29
 We similarly find the statute of frauds inapplicable to the present case. The California statute provides that "an agreement that by its terms is not to be performed within a year from (the) making thereof" shall be invalid. Cal.Civ.Code, § 1624(1). It has been held to apply only to those contracts which, by their terms, cannot possibly be performed within one year. White Lighting Co. v. Wolfson, 68 Cal.2d 336 n.2, 438 P.2d 345, 66 Cal.Rptr. 697, 701 n.2 (1968). Because defendants' promise to make McGrath president upon Forni's retirement could have occurred within one year and because it was possible to enroll McGrath in the Zenith stock option program and make him a member of the executive compensation bonus group at any time after the sale was consummated on July 31, 1972, the rule is without force in the present case.
 
 
 30
 Accordingly, we find that the jury could properly have imposed liability under the breach of contract theory.
 
 The Securities Fraud Claim
 
 31
 Plaintiff's securities fraud claim urged that defendants were liable for violations of section 10(b) of the Securities Exchange Act of 1934[2] and Securities Exchange Commission Rule 10b-5[3] promulgated thereunder. On this appeal defendants do not dispute the fact that the jury could have determined that their promises to make McGrath president of the acquired company constituted misrepresentations, but rather object that the statements were not made "in connection with" a sale or purchase of a security and were not material.
 
 
 32
 Considering first the question of materiality, the parties agree that the applicable test is that articulated by the Supreme Court in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in determining his or her course of conduct. See id. at 449, 96 S.Ct. at 2132.[4] Materiality presents a mixed question of law and fact, and as the Court in TSC Industries emphasized, "(t)he determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of these facts to him, and these assessments are peculiarly ones for the trier of fact." Id. at 450, 96 S.Ct. at 2132. The scope of appellate review, therefore, is limited: only where reasonable minds cannot differ on the issue of materiality may a court determine the issue as a matter of law. See id. at 450, 96 S.Ct. at 2132.
 
 
 33
 The defendants argue that no reasonable investor could possibly have attached importance to his future employment prospects upon being told, as Fisher told McGrath, that Zenith did not enter into employment contracts with its executive officers. We cannot accept this view. Defendants' argument ignores Fisher's earlier statements that Zenith had no objection to McGrath succeeding Forni and that once he was president he would be entitled to special benefits. It also fails to consider Fisher's immediate assurance, notwithstanding the no-written-contracts rule, that McGrath was the heir apparent to the presidency of the company. The issue presented to the jury was whether a reasonable investor would have considered such utterances important in deciding whether to sell his or her securities. It cannot be said as a matter of law that these statements carried no weight in the seller's decision-making process.
 
 
 34
 The defendants rely on Robinson v. Cupples Container Co., 513 F.2d 1274 (9th Cir. 1975), for the proposition that a promise of employment is not a material factor in the decision to sell securities. In Robinson, the plaintiff, a partner in an acquired company, alleged that the acquiring company's false promise to employ him violated Rule 10b-5. The Robinson court held the promise of employment not material, but made clear, however, that its decision rested squarely on the particular facts of that case and that a different result might ensue under other circumstances. We think the facts of this case differ significantly from those in Robinson and justify a finding of materiality. In Robinson, the alleged promise was made only at an exploratory meeting between the parties and was never repeated during several months of negotiations that followed. Here, the promise of employment was repeated several times during the course of the negotiations, at a time near to the consummation of the actual transaction. Under such circumstances, the jury was entitled to find that the promise of employment would have been a material factor in McGrath's decision to relinquish his securities.
 
 
 35
 As to defendants' contention that the misrepresentations were not made "in connection with" the purchase or sale of a security, again, we find no merit.
 
 
 36
 In Superintendent of Life Insurance v. Banker's Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 28 L.Ed.2d 321 (1971), the Supreme Court stated that "Section 10(b) must be read flexibly, not technically and restrictively." Id. at 12, 92 S.Ct. at 168. It is necessary, therefore, in construing the phrase "in connection with the purchase or sale of any security," to consider the facts of the individual case. See Goodman v. Epstein, 582 F.2d 388, 410-411 (7th Cir. 1978), cert. denied, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). The test for determining whether the fraud was "in connection with" the sale, is whether the transaction involving the fraud may be said to "touch" the transaction involving the purchase. Smallwood v. Pearl Brewing Company, 489 F.2d 579, 595 (5th Cir. 1974) (interpreting Banker's Life).
 
 
 37
 McGrath was free to refuse to sell his shares or to abort the entire transaction by refusing to waive his option. The misrepresentations of the defendants, which the jury was entitled to deem material to his decision-making process, are surely close enough to satisfy the touching or "in connection with" requirement of section 10(b).
 
 
 38
 The defendants rely inappropriately on Ketchum v. Green, 557 F.2d 1022 (3d Cir. 1977), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1978), for the proposition that false promises concerning employment are not made "in connection with" the sale or purchase of any security. Ketchum does not stand for such a rule and its facts are clearly distinguishable. In Ketchum, the defendants contrived to oust the plaintiffs from their positions as officers of a corporation by various misrepresentations. Once this ouster was accomplished, the defendants had the plaintiffs' employment with the corporation terminated. Their termination triggered a requirement in the corporate charter that the plaintiffs sell their company stock back to the corporation at a predetermined price. The Ketchum court held that this forced sale was not sufficiently connected to the misrepresentations to support liability under section 10(b). The court emphasized that "the purportedly deceptive practices occurred, if at all, in connection with the struggle for control of the corporation." 557 F.2d at 1028. That is, the defendants' intention was to oust the plaintiffs, not to acquire their stock. Here, by contrast, Zenith's objective was to acquire all Basford shares, and the false promises were made in order to achieve that objective. Consequently, the Ketchum rationale does not control the result in the present appeal.
 
 
 39
 Defendants further argue, citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1976), that even if McGrath waived his stock option in return for defendants' promise concerning his future employment, the forbearance of such a conditional purchase opportunity cannot form the basis for a section 10(b) or Rule 10b-5 violation. We find it unnecessary to consider this question, but see International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 562, 99 S.Ct. 790, 797, 58 L.Ed.2d 808 (1979), because plaintiff's claim is based upon the sale of his Basford shares, as well as on the waiver of his option, and there is no question that the former may serve as the predicate for an action under the securities law.[5]The Common Law Fraud Claim
 
 
 40
 Plaintiff's common law fraud claim was based on the failure of Fisher or Forni to tell McGrath about their conversation on July 13 concerning McGrath's lack of suitability to become president of the acquired company. Defendants assert that this non-disclosure may not give rise to liability because there was never a duty to speak. Alternatively, they argue that even if such an obligation existed, the resulting misrepresentation or concealment was not material, was not a reasonable basis for reliance, and was not causally related to any losses plaintiff may have sustained. We find each of defendants' points to be without merit.
 
 
 41
 This is not a case of mere non-disclosure, but of both failure to correct a material representation, once the maker of the statement knew it to be false, and of concealment of relevant information. Only minutes after Fisher told McGrath that he was the "heir apparent" to the company's presidency and that as far as he understood Zenith had no objections to his succeeding Forni, Fisher learned from Forni that there were serious doubts as to whether McGrath would ever be promoted to the top position. Fisher never bothered to correct his representations though it is reasonable to infer from the facts that he knew McGrath might well rely on his statements. As to Forni, when questioned the next day by plaintiff, he denied that he had discussed plaintiff's career with Fisher. All this transpired at a point in time prior to the signing of the agreement of sale, prior to the closing of the transaction, and prior to the point at which the agreement to surrender the option was to go into effect.
 
 
 42
 We believe that under these circumstances it was incumbent upon Fisher to correct his earlier statements. It is without significance that at the time those statements were made Fisher believed them to be true. See Black v. Shearson, Hammill & Co., 266 Cal.App.2d 362, 72 Cal.Rptr. 157, 160 (1968). The making of the original statements, the discovery of their falsehood, and the failure to correct them before plaintiff relied on them were "elements in a continuing course of conduct" capable of establishing fraud. Id. 72 Cal.Rptr. at 160. While Forni was not a party to the original conversation, there was evidence to show that he lied to McGrath about a matter material to McGrath's sale of his shares and surrender of his option. Thus the scienter requirement is satisfied. Because Forni was personally interested as a stockholder in the sale going through he had a duty to discuss information that he must have known was material when questioned by McGrath. See Fisher v. Pennsylvania Life Co., 69 Cal.App.3d 506, 512-513, 138 Cal.Rptr. 181, 184-185 (1977). Forni was also president and a director of the corporation in whose favor McGrath was releasing the option. One way or the other, Forni had virtually the same type of duty which Zenith had not to mislead McGrath to induce a sale of his stock and release of his option.
 
 
 43
 As to defendants' challenges to materiality, justifiable reliance, and proximate causation of damages, it is sufficient to note that each of these issues were questions of fact and have been resolved by the jury in plaintiff's favor. There was adequate evidence introduced at trial to support the factual findings and that being so the conclusions of the jury should not be disturbed on appellate review.
 
 Measure Of Compensatory Damages
 
 44
 We now turn to the most difficult question raised by this appeal, the appropriateness of the jury award of compensatory damages. Essentially, we are concerned here with whether plaintiff was entitled to recover for loss of future earning capacity resulting from the damage to his career and business reputation suffered as a consequence of his dismissal. McGrath's claim was that because he was not eased out in a decorous manner so that he could look for a new job as an ex-president instead of a summarily discharged vice-president his career was permanently harmed. Plaintiff sought to recover for these losses under each of the three theories of liability, the jury was so instructed, and defendants now devote virtually all of their argument on the compensatory damage issue to challenging the propriety of an award for damage to plaintiff's career. Thus, while it is true that other elements of damages e. g., the expenses of moving and finding a new position may have been considered by the jury in reaching its million dollar compensatory damage verdict, the parties agree that such an amount could only be justified if plaintiff was entitled to compensation for injury to his career. We, therefore, focus our discussion on this question.
 
 
 45
 At trial, Dr. Hugh Holmes, an executive search consultant, testified that because of McGrath's inability to explain the circumstances of his firing at Basford or to furnish reliable references[6] he became an unattractive candidate for other executive positions. The result, according to Holmes, was that plaintiff's career was permanently damaged and his earning capacity was diminished. As a means of assessing plaintiff's overall loss of earnings, the Hay System, which is a widely accepted method of evaluating executive and management positions, was employed by the witness. The Hay System weighs certain factors involved in a job, assigns point values to these factors, and, by comparison of compensation levels from all industries and institutions using the Hay System, establishes a compensation range of jobs at the various point levels. After analyzing the presidency of Basford and determining the salary plaintiff would have made in that position, Holmes formed the opinion that the dollar amount of McGrath's injury prior to the time of trial was $347,431. This was arrived at by subtracting what McGrath actually earned from what he would have earned in a position comparable to the presidency of the Zenith subsidiary. Dr. Holmes further calculated McGrath's continuing loss to be $50,000 per year.
 
 
 46
 Dr. Charles Linke, an economist, using Dr. Holmes' figures, estimated the present cash value at the time of trial of plaintiff's pre-trial loss at $371,107. He also set the present cash value of each $1,000 of McGrath's annual future losses at $12,662, assuming that plaintiff worked until he was 65 years of age.
 
 
 47
 With these figures before it, the jury concluded that plaintiff was entitled to one million dollars in compensatory damages.
 
 
 48
 Defendants now argue that the claims for breach of contract, securities fraud, or common law fraud could not have supported such an award and that injury to one's business reputation or career is not a compensable element of damage under any of the three theories. Under the contract count, defendants claim McGrath could not recover for inability to find a job, and that while damages are permitted for loss of ability to perform work, plaintiff's employment with Fleetwood subsequent to his discharge conclusively showed no such injury was sustained. Plaintiff's maximum award under the contract theory, they assert, would have been restricted to net lost earnings during the three year period immediately following his discharge, because McGrath's request for a written contract which was refused definitively proved that the outside limit of his expectation of employment was three years. Recovery under the securities claim, according to defendants, is limited to "actual damages" and does not include compensation for destruction of one's business reputation. Under this rationale, defendants contend, plaintiff was entitled to recover nothing for he stipulated at trial that he had received a fair price for his Basford shares and thus failed to prove any loss. Finally, under the common law fraud count, defendants argue that damages are restricted by the "benefit of the bargain" rule. They claim that because future earnings are not an "out of pocket" loss they are not recoverable in a fraud action, and that at most plaintiff could have received damages for his net loss of earnings during the three years following his discharge and for the lost value of his stock option.
 
 
 49
 We find that defendants are precluded from successfully advancing their position on the appropriate measures for computation of compensatory damages by the combined operation and effect of the rule of preservation and the presumption of verdict validity.
 
 
 50
 Plaintiff has argued before this court, and defendants have failed to refute, that with respect to the contract and common law fraud counts, defendants did not object at trial to inclusion in the jury instructions of the elements of damage of which they now complain. On the contract count, the jury was instructed that:
 
 
 51
 "The plaintiff seeks damages for various losses which he claims to have suffered as a proximate result to the defendants' breach of contract or breach of implied obligation of good faith and fair dealing ... (including) loss of future earning capacity as a result of the way in which he was dismissed.
 
 
 52
 "....
 
 
 53
 "If you find that the plaintiff's future earning capacity ha(s) been diminished, you must determine the present cash value of the earnings which plaintiff can reasonably be expected to have earned in the future if defendants' promises had been fulfilled, subtracting from that amount the present cash value of the earnings which plaintiff can now reasonably be expected to earn in the future."
 
 
 54
 Similarly, the common law fraud instruction stated:
 
 
 55
 "Damages ... include the following elements:
 
 
 56
 "If you find that plaintiff's career was damaged as a proximate result of the fraud, the amount of money which plaintiff would have been able to earn from the time of the fraud to the present time, deducting therefrom the amount which he reasonably could have earned, plus the present cash value of his earning capacity reasonably certain to be lost in the future as a result of the fraud."
 
 
 57
 Having failed to object to these instructions at the time of their submission, as is required by F.R.C.P. 51,[7] defendants have waived any errors therein. Questions as to the measure of damages may not be considered on appeal where they have not been raised at trial. See The Prudence Company, Inc. v. Fidelity & Deposit Company of Maryland, 297 U.S. 198, 207, 56 S.Ct. 387, 80 L.Ed.2d 581 (1935); see also, Rouse v. Chicago, Rock Island and Pacific Railroad Co., 474 F.2d 1180, 1184 (8th Cir. 1973); V-M Corp. v. Bernard Distributing Co., 447 F.2d 864, 867 (7th Cir. 1971); Arkla Exploration Co. v. Boren, 411 F.2d 879, 883-884 (8th Cir. 1969); 5 Am.Jur.2d, Appeal & Error, § 640, pp. 94-95. Consequently, the alleged errors in the common law fraud and contract counts are not preserved for appellate review and we may not pass upon them.
 
 
 58
 As to the correctness of the charge on the third theory of liability securities law fraud the parties hotly contest the question of preservation. The record clearly indicates that at one point during the instruction conference defendants objected to the proposed charge on the ground that career damages were not compensable in connection with a securities law violation. But plaintiff argues that this basis for protest was subsequently waived when defendants expressly approved a redrafted version of the instruction,[8] objecting then specifically to only one matter not here relevant. Even if we assume, however, that the alleged error is preserved and has merit, defendants are not entitled to a reversal or a new trial because they cannot show that this error in any way affected the jury's decision. This is so due to the nature of the jury's verdict and the fact that the errors in he other two counts are not preserved.
 
 
 59
 The form of verdict returned by the jury, as noted earlier, awarded plaintiff one million dollars in compensatory damages against all defendants, but did not specify the theory under which liability was imposed. It further rendered separate verdicts against each defendant for punitive damages aggregating a second million dollars.[9] The district court thereafter entered a single judgment for compensatory damages imposing joint and several liability against all defendants and separate judgments for punitive damages against the individuals.
 
 
 60
 Presuming, as we must on appellate review, that the jury followed its instructions, it is clear that the compensatory damage award could not have been predicated solely upon the contract count for the breach of contract action was brought against only two defendants, Zenith Radio and Zenith Distributing, whereas the award was levied jointly against all four defendants.[10] Moreover, the contract count by itself could not have supported the punitive damage award, the jury having been properly charged that such damages could be imposed in this case only if defendants were found liable for common law fraud. The jury, nonetheless, without having found merit to the securities law charges, could have based its compensatory damage award exclusively on the common law fraud count, which was alleged against all defendants.[11] On this rationale, the jury would have been entitled to award damages for loss of future earning capacity, since it had been so instructed by the court, without objection by defendants. The imposition of punitive damages would also have been appropriate, assuming that the facts warranted such sanctions.[12] Because the jury's compensatory and punitive damage awards may have rested solely upon the common law fraud theory, which finds factual support in the record and as to which no error is preserved for review, we need not consider whether the section 10(b) and Rule 10b-5 count could have sustained an award of compensatory damages. Even if we assume arguendo that the instruction relating to the securities violation was erroneous it cannot be shown, other than on the basis of speculation or conjecture, to have affected the jury's decision, there being a totally adequate independent theory upon which the verdict may have rested. Defendants fall short of carrying the burden the law places upon them in attempting to disturb the judgment below. On appeal, "(e)rror is not to be presumed but must be made affirmatively to appear by the party asserting it ... every intendment must be indulged in favor of the validity of the judgment appealed from." Wabash Ry. Co. v. Bridal, 94 F.2d 117, 121 (8th Cir.), cert. denied, 305 U.S. 602, 59 S.Ct. 63, 83 L.Ed. 382 (1938); see also, Berenter v. Staggers, 362 F.2d 971, 972 n.2 (D.C.Cir.1966). It would be an abuse of our powers of appellate review to upset the judgment below on the basis of mere speculation.
 
 Amount Of Compensatory Damages
 
 61
 While we conclude that defendants may not challenge the inclusion of career damages as an element in the computation of the jury's award, there remains the question of whether a value was assigned to this factor by the jury on the basis of speculation.[13] Defendants argue that it was improper for the jury to assume, in deciding to what extent McGrath's career was damaged, that McGrath would have had the most favorable experience possible as president of the acquired company and that his employment in that position or in a similar position with another company would have continued until McGrath chose to retire. We think there is merit in this contention.
 
 
 62
 Zenith could have fulfilled its promise to McGrath by making him president of the subsidiary. McGrath would have had no tenure and Zenith could have fired him at will as long as it acted in good faith. The question is whether plaintiff proved that it was likely that he would have continued as president, and for how long. At trial plaintiff's evidence on the issue of reduced earning capacity was presented primarily by Dr. Holmes and Dr. Linke. Dr. Holmes calculated plaintiff's pre-trial loss to be $347,431 by finding the difference between what an average executive occupying a position similar to the presidency of Basford would have made during those years and what McGrath actually earned. He further computed plaintiff's future losses to be $50,000 per year by projecting forward McGrath's pre-trial losses. Implicit in Dr. Holmes' calculations was the assumption that if McGrath had originally been made president of Basford he would have continued in that position or would have held an equivalent job elsewhere. There is, however, no evidence in the record to support this assumption. No one testified as to how long it was likely that McGrath would have retained the Basford presidency. Dr. Holmes did not address the question and, indeed, when asked whether he could "tell the jury how long after trial (McGrath's career damage) would extend on an annual basis," he said that he could not, that he was "not qualified to do so." Similarly, Dr. Linke, who testified that the average work life expectancy for a person McGrath's age was 15.3 years, did not opine that it was likely that McGrath would have performed satisfactorily in the Basford position and would have continued to hold that office or a comparable job. Dr. Linke's calculations of the present cash value of plaintiff's pre-trial and post-trial losses (as determined by Dr. Holmes) simply assumed that plaintiff's employment would extend to the normal retirement age of 65. We must conclude that the jury was asked to speculate without evidence in the record that if McGrath had been given a decent interval as president, he would have continued to earn at that level for 15 or 16 years. Consequently, the million dollar compensatory damage award may not be upheld.
 
 
 63
 We think it appropriate to give plaintiff the option of accepting a reduced amount of compensatory damages or submitting to a new trial on the issue of damages only. While the verdict, with respect to future losses, was speculative because the jury had to assume continued life, employability, and favorable professional experience on the part of McGrath over a 15- or 16-year period, the same may not be said of the pre-trial losses component of the damage award. At the time those losses were assessed McGrath had already lived nearly six years past the breach of the contract, and to that extent the mortality factor was eliminated from the jury's deliberations. Also, the fact that plaintiff had worked for Fleetwood for three years in a high-level (though not equivalent) position provided some evidence of his continued employability as an executive. We think the evidence would have supported a verdict that McGrath, if he had been given the promised opportunity, would have worked at a higher level up until the time of trial. Bearing in mind that pre-trial losses extended over almost six years and that Dr. Holmes testified that, after adjustment for unusually low earnings in 1977 and 1978, McGrath's pre-trial losses averaged about $50,000 per year, we conclude that it is fair to offer plaintiff the option of accepting $300,000 in compensatory damages or being relegated to a new trial on the issue of damages alone.
 
 Punitive Damages
 
 64
 Defendants challenge the punitive damage awards on the theory that recovery of punitive damages depends upon proof that defendants actually intended to injure the plaintiff and that such evidence is wanting in the present case. We believe that defendants misstate the applicable standard and that when judged according to the correct rule the jury verdict is supported by the record.
 
 
 65
 Under California law, the "malice" necessary to support an award of punitive damages is not necessarily personal spite or ill will toward the plaintiff. There are decisions at the appellate level that hold that where there is a finding of fraud, that "alone is an adequate basis for awarding punitive damages." Oakes v. McCarthy Company, 267 Cal.App.2d 231, 263, 73 Cal.Rptr. 127, 146 (1968); see also, Miller v. National American Life Ins. of California, 54 Cal.App.3d 331, 336, 126 Cal.Rptr. 731, 733 (1976) (construing the California punitive damages statute). In any event, the California Supreme Court has held in two recent cases that what is required is that the defendant have acted with "an intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights." Neal v. Farmers Insurance Exchange, 21 Cal.3d 910, 922, 582 P.2d 980, 148 Cal.Rptr. 387, 395 (1978); Silberg v. California Life Ins. Co., 11 Cal.3d 452, 462, 521 P.2d 1103, 1110, 113 Cal.Rptr. 711, 718 (1977). One of these cases said that this state of mind can be proved either expressly or by implication. See Neal, supra, 148 Cal.Rptr. at 396 n.6. In the present case, the jury could have concluded that the defendants were seeking to benefit themselves by the sale of Basford to Zenith, and that the transaction was possible only because McGrath's rights had been disregarded and he had been misled into relinquishing his option and stock in reliance upon the statements and conduct of the defendants. In light of this and our earlier discussion of the evidence supporting a finding of common law fraud, we have little difficulty concluding that the jury was entitled to award punitive damages. While contrary inferences as to the intentions of the defendants might have been drawn from the evidence, that decision was one for the jury and is not subject to being disturbed on appellate review.
 
 
 66
 Finally, inasmuch as defendants do not specifically challenge the punitive damage awards as excessive or as totally disproportionate to the acts committed or to the wealth of the defendants, we note only that the amount of such awards is a matter for the discretion of the jury and that where, as here, there is the support of substantial evidence in the record, an appellate court should not substitute its judgment for that of the trier of fact. Accordingly, if plaintiff accepts $300,000 in compensatory damages, the award of punitive damages will remain undisturbed.[14] If, however, plaintiff submits to a new trial on damages, the new trial will embrace both compensatory and punitive damages.[15]
 
 
 67
 Accordingly, we affirm the judgment appealed from, except insofar as concerns the award of damages, which cause is remanded to the district court in accordance with this opinion. Plaintiff is allowed two-thirds of his costs of appeal.
 
 
 68
 SWYGERT, Circuit Judge, dissenting.
 
 
 69
 I respectfully dissent from the holding of the majority and would reverse the judgment of the district court.
 
 
 70
 * I disagree with the majority's holding that the jury could permissibly have imposed liability against Zenith as the result of a breach of contract. In my judgment, neither an express nor an implied contract for the future employment of McGrath, with concomitant stock purchase opportunities and a possible bonus, was established by the evidence as a matter of law. McGrath testified that Fisher said that "it would have to be that there would be no contract." Fisher's additional statement to McGrath about the latter being the "heir apparent," expressed at most a future event entirely speculative a conjectural not a guaranteed reality.[1]II
 
 
 71
 I cannot agree with the majority's conclusion that the alleged misrepresentations to McGrath about his future employment relationship with Basford or its successor constituted fraud under section 10(b) of the Securities Exchange Act in connection with either the sale of his shares of Basford stock or the relinquishment of his conditional option to purchase additional shares. As for the sale, the alleged misrepresentations were made with respect to McGrath's future employment, not the sale of his securities. McGrath participated in negotiating the thirty-eight dollar price per share he and the other shareholders received for their stock. That price was agreed upon before the alleged misrepresentations were made, and it was stipulated at trial that the price was fair. No present employment opportunities or promises of future employment entered into the considerations given to fixing the price per share. Moreover, if such promises had caused a lower price, McGrath would have been given an unfair preference over the other Basford shareholders. McGrath's claim that he was misled would have resulted, if his claim of liability under Rule 10b-5 were allowed, in a serious wrongdoing at the expense of the other Basford shareholders. The sale as it stood netted him a $40,000 profit.
 
 
 72
 McGrath's claim that the relinquishment of his option to purchase additional shares of Basford stock constituted fraud in connection with the purchase of a security giving rise to liability under Rule 10b-5 is in my judgment contrary to the majority view, controlled by Manor Drugs v. Blue Chip Stamps, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). See also International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). Manor Drugs' decision to surrender its opportunity to buy Blue Chip shares was held to afford no basis for a Rule 10b-5 claim, even absent any preconditions to an exercise of that opportunity. Here, McGrath's opportunity to buy additional Basford shares was not unqualified but was subject to his continued employment for at least three years. The fulfillment of that condition was conjectural to say the least. A fortiori this case has less connection with the purchase of a security than Manor Drugs.
 
 III
 
 73
 I am also unable to agree with the majority ruling that the alleged misrepresentation to McGrath about his becoming president of Basford or its successor constituted common law fraud in connection with McGrath's sale of Basford shares or the relinquishment of his conditional opportunity to buy additional shares.
 
 
 74
 The misrepresentations were made in connection with McGrath's future employment, not the sale of his Basford stock. He had participated in setting the thirty-eight dollar figure he and the other shareholders received, and it was stipulated at trial that the price was fair. Significantly, the price per share was negotiated long before the alleged misrepresentations were made.
 
 
 75
 Plaintiff argues that had he been told of Fisher's conversation with Forni, he might have blocked Zenith's acquisition of Basford by refusing to sell his Basford shares or to give up his conditional opportunity to buy more. McGrath, however, could not have effectively blocked the sale or kept his opportunity to buy. His right to keep his shares and the opportunity to buy more shares were contingent upon his continued employment by Basford. He could have been fired at any time. Under the terms of his contract, his right to buy more shares would have been extinguished, and he could have been forced to sell both his acquired shares to the employee stock trust at less than book value.
 
 IV
 
 76
 Given my view of the case, I would not reach the question of damages. But if I did, I am of the opinion that the award of punitive damages in any amount was improper.
 
 
 77
 Punitive damages are not favored by the law and should be awarded only under extraordinary circumstances. Actual intent to injure a plaintiff is required. Here no such intent was demonstrated by the evidence. Rather, it shows that Fisher prevailed upon Forni to wait several months before making any decision about McGrath's future and that he was not in fact fired until after Forni had observed McGrath's performance for four months under the new organization.[2] In addition, Fisher arranged benefits for McGrath more generous than those customarily given by Zenith or Basford. Forni furnished written reference to McGrath, and Fisher offered to serve as a reference. Finally, Zenith helped McGrath to find a comparable executive job with Fleetwood, a Canadian company. Surely these gestures of helpfulness by the defendants towards McGrath refute any malicious intent to harm him. To award him one million dollars in punitive damages in these circumstances is to work a grave injustice instead of rectifying one.
 
 
 
 [1]
 Section 1331(a) provides:
 "The district court shall have original jurisdiction of all civil actions wherein the matter in controversy ... arises under the Constitution, laws, or treaties of the United States...." 28 U.S.C. § 1331(a)(1976).
 
 
 [2]
 Section 10(b) provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national security exchange
 "....
 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (1976).
 
 
 [3]
 Rule 10b-5 provides:
 "It shall be unlawful ...
 "(a) To employ any device, scheme, or artifice to defraud,
 "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.
 
 
 [4]
 TSC Industries arose under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1976) and Rule 14a-9, 17 C.F.R. § 240.14a-9, relating to false statements in proxy solicitations. While in this case the plaintiff relies on section 10(b) and Rule 10b-5, the test for materiality under these statutes and rules is the same. See e. g., Wheat v. Hall, 535 F.2d 874 (5th Cir. 1976) (citing TSC Industries for the test of materiality under Rule 10b-5)
 
 
 [5]
 Expressions found in Frederiksen v. Poloway, 637 F.2d 1147 (7th Cir. 1981), do not require a contrary result. There stock in a corporation was transferred as an incident of the sale of a business. Frederiksen and his company, who were the buyers and plaintiffs, claimed they had been defrauded by the defendant seller and former sole owner. In McGrath, plaintiff was one of a number of people who had invested in Basford stock. Plaintiff as a seller of stock claimed fraud on the part of the buyer. The only fact in common with Frederiksen is that the buyer in the transaction became the sole owner of the corporation. The dispositive factor in Frederiksen was that "(t)he stock ... merely was passed incidentally as an indicia of ownership of the business assets sold ...." 637 F.2d at 1151-1152. Neither in the hands of the sole shareholder/seller, nor in the hands of the purchaser who "strongly assumed management control of the business," 637 F.2d at 1153, did the purchase meet the requirements of the "economic reality" test as representing an investment, by the person seeking protection of the securities laws, in a common venture premised on a reasonable expectation of profits to be derived from the efforts of others. In McGrath, in contrast, the Basford shares were investments on the part of the individual employees who held those shares. The Basford shares constituted "securities" in the hands of plaintiff as well as the other sellers and they did not lose that status merely by reason of the fact that all of the Basford shares were sold at the same time. To conclude otherwise would be to hold that a purchaser of corporate shares may deprive investors/sellers of the protections of the securities laws if it can arrange that all of the corporation's shares are purchased at one time. Whatever the breadth of language, clearly Frederiksen does not require such a result
 
 
 [6]
 The record, however, indicates that on November 28, 1972, Fisher told McGrath that he could use him as a reference and could count on receiving a good recommendation. McGrath apparently did not trust this promise and did not use persons from Basford or Zenith as references during the interviewing process. Toward the end of his job search McGrath did obtain a letter of reference from the Comptroller of Zenith Distributing, dated March 14, 1973, and addressed "To whom it may concern," which was highly laudatory of plaintiff's performance and abilities. A similarly addressed letter, shorter and more reserved, was secured from Forni, dated April 4, 1973. It does not appear that these letters were ever put to any use
 
 
 [7]
 F.R.C.P. 51 provides in relevant part:
 "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."
 
 
 [8]
 The securities fraud instruction read in pertinent part:
 "In order to determine that plaintiff is entitled to damages as a consequence of his claim of loss of business reputation as a result of the alleged securities laws violation, you must find that:
 "1. But for the securities law violations, plaintiff would not have suffered this damage and that this damage cannot be attributed to any intervening cause which could not have been foreseen at the time of the securities law violation;
 "2. (T)he damage to plaintiff's business career is not conjectural or speculative, but real and capable of being reasonably determined;
 "3. (T)he plaintiff exercised reasonable care in an effort to minimize damage to his business career."
 
 
 [9]
 The punitive damage verdicts were as follows: against Forni, $250,000; against Fisher, $150,000; against Zenith Distributing, $300,000; against Zenith Radio, $300,000
 
 
 [10]
 The common law fraud and securities fraud counts were alleged against all four defendants
 
 
 [11]
 It might also be argued that the jury's verdict may have been based upon a finding of liability under both the contract and common law fraud counts. However, this theory raises the unnecessary question of whether a compensatory damage verdict in one single sum against all defendants would have been appropriate where, for instance, both corporate defendants were found liable under two counts, but the individual defendants under only one. The jury instructions are not clear on this point and it need not be resolved since both the compensatory and punitive damage awards may be sustained solely upon the common law fraud theory
 
 
 [12]
 See the discussion of punitive damages, infra, at pp. 473-474
 
 
 [13]
 On the matter of damage to plaintiff's career, the jury was charged:
 "In the event that you find that plaintiff is entitled to damages arising in the future because of loss of earnings, you must determine the amount of these damages which will arise in the future.
 "If these damages are of a continuing nature, you may consider how long they will continue. If they are permanent in nature, then in computing these damages you may consider how long the plaintiff is likely to live.
 "With respect to a loss of future earnings, you may consider that some persons work all their lives and others do not; that a person's earnings may remain the same or may increase or decrease in the future.
 "According to the evidence, the working life expectancy of a person aged 49 years is 15.3 years. This figure is not conclusive. It is the average work life expectancy of persons who have reached the age of 49. It may be considered by you in connection with other evidence relating to the probable life expectancy of the plaintiff in this case, including evidence of his occupation, health, habits, and other activities, bearing in mind that some persons live longer and some persons less than the average."
 
 
 [14]
 Under California law, an appellate court may reduce the amount of an award of compensatory damages while leaving intact the punitive damage verdict. See Walker v. Signal Companies, Inc., 84 Cal.App.3d 982, 149 Cal.Rptr. 119 (1978). Here, the jury's four separate verdicts imposing punitive damages in differing amounts ($250,000 against Forni, $150,000 against Fisher, $300,000 against Zenith Distributing, and $300,000 against Zenith Radio) reflect a careful assessment of the gravity of each defendant's conduct and other relevant factors, and none of these awards may be said to be unreasonably disproportionate to the proper sum of compensatory damages, namely $300,000
 
 
 [15]
 This appears to be required by the law of California, see Liodas v. Sahadi, 19 Cal.3d 278, 284, 562 P.2d 316, 137 Cal.Rptr. 635, 638 (1977) and the cases cited therein, and the parties have treated the law of California as controlling
 
 
 [1]
 Immediately after being told that Zenith did not offer employment contracts to their executives, McGrath signed the following waiver, which makes no mention of any additional promises, implied or otherwise:
 Robert Edward McGrath ("McGrath") and Zenith Radio Research Corporation ("Zenith") agree as follows:
 
 
 [1]
 If Zenith acquires all of the outstanding Class B common stock of H. R. Basford & Company pursuant to a certain agreement by and between the shareholders of H. R. Basford & Company, H. R. Basford & Company, and Zenith, then McGrath agrees to rescind that certain agreement dated August 18, 1971, between H. R. Basford & Company and Robert Edward McGrath, and Zenith agrees to cause H. R. Basford & Company to agree to such rescission
 
 
 [2]
 During that time, for example, McGrath escorted a group of Basford customers on a trip to Spain but let the customers return on their own, while he remained in Spain to extend his vacation