Joseph G. WORTLEY, et al., Plaintiffs,

v.

Peter M. CAMPLIN, Sr., Defendant.

No. CIV.01–122–P–H.

United States District Court,
D. Maine.

Aug. 9, 2002.

David J. Perkins, Patrick Jackson Mellor, Perkins, Olson & Pratt, Portland, ME, for plaintiffs.

Paul F. Macri, William D. Robitzek, Berman & Simmons, P.A., Lewiston, ME, for defendant.

## DECISION AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR NEW TRIAL

HORNBY, Chief Judge.

On April 7, 2000, after an abbreviated period of negotiations, Peter Camplin sold the Sea Dog Brewing Company, a financially distressed restaurant chain, to Joseph Wortley.[1] Soon after closing the deal, Wortley and Camplin began to disagree about the terms of the sale, the nature of the company's assets and liabilities, and the operation of the restaurants. Ultimately, these disagreements led Wortley to sue Camplin for a range of claims based upon contract, common law fraud, and securities fraud; Camplin countersued on similar grounds. After a three-day trial, the jury awarded Camplin $265,000 on his securities fraud claim (rejecting the remainder of Camplin's claims and all of Wortley's claims). Wortley now challenges this award.[2] Because the verdict is legally and factually sound the Motion for Judgment as a Matter of Law or for New Trial is DENIED.

1. The basic details of the contested transaction (who sold the stock to whom) are complicated by the fact that Wortley and Camplin both relied heavily on proxies, corporate and human, to manage their interests in the Sea Dog. Title to the Sea Dog stock and liability for the Sea Dog's debts (or, more precisely, the priority and rights of Sea Dog's creditors) were correspondingly complex. Issues surrounding the relationships between Wortley and Camplin and their respective proxies were sufficiently developed at trial; there is no need to re-examine them here except where they are specifically relevant to the resolution of this motion. The following summary is generally sufficient. Wortley and Camplin entered into a Stock Purchase Agreement (SPA) on April 7, 2000. On May 1, 2000, Wortley assigned his rights in the SPA to his wife, Barbara, and she waived a number of conditions in the SPA. On May 2, 2000, Camplin executed a stock power, transferring his interest in the stock to Barbara Wortley; she then immediately transferred the stock to a family trust, for which Joseph Wortley was the trustee.

2. Wortley also contests the disposition of two claims that depend on the interpretation of the warranties in the SPA. The SPA contained two provisions (in different sections) that required Camplin to transfer the stock free and clear of all encumbrances. Before trial, I

Based on the jury's verdict, I entered judgment for Camplin on a single count: federal securities fraud. In order to prevail on that claim, Camplin had to prove that: (1) Wortley made a materially false or misleading statement (or omitted a fact necessary to make a statement not misleading); (2) in connection with the purchase or sale of a security; (3) with the intent to deceive, manipulate, or defraud; and (4) Camplin was injured by his reasonable reliance on Wortley's misrepresentations. 17 C.F.R. § 240.10b–5 (2000); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 194 (1st Cir.1999); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216–17 (1st Cir.1996). "[M]aking a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate [federal securities law] where the promise is part of the consideration for the transfer of securities." [3] *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986); *see also Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir.2000).

■■■ Wortley presents a range of challenges of the sufficiency of the evidence. He was entitled to, and did, make these arguments to the jury. Having been first rejected by the jury, none of these factual challenges is now persuasive. Camplin alleged, and there was sufficient evidence for the jury to have found, that Wortley made at least one of the following promises [4] in order to convince Camplin to sell [5] the Sea

ruled that Wortley waived one of these provisions as part of the process of closing the deal, but that it was for the jury to decide whether he waived the second. I also ruled that, by waiving the first of these provisions, Wortley also waived a similar U.C.C. warranty. *See* 11 M.R.S.A. § 8–1108 (2001). Wortley now seeks reversal of my decision on his U.C.C. claim and the jury's verdict with respect to the second warranty in the SPA. Wortley's motion with respect to these two issues is denied.

3. Although Wortley correctly recognizes the actionability of future promises in a federal securities fraud claim, citing *Gurary*, the motion includes arguments about the actionability of future promises in a Maine common law fraud claim, a claim no longer before the court. The Maine caselaw is not pertinent to the federal claim.

4. Wortley argues that these promises are insufficiently specific to be actionable. A false representation about future conduct need not be as specific as Wortley argues (Wortley cites a Maine common law fraud case); it is enough that Wortley made a "specific promises ... to perform particular acts that [he] did not intend to carry out or knew could not be carried out." *Luce*, 802 F.2d at 56 (promise by general partner defendant to "maintain its net worth at a level sufficient to ensure the partnership's profitability" is actionable); *see also, e.g., Wilsmann v. Upjohn Co.*, 775 F.2d 713, 719 (6th Cir.1985) (defendant could be, but on the evidence was not, liable for promises to promote product and pay flexible performance bonus); *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 466 (7th Cir.1981) (defendant could be liable for representation that plaintiff was "heir apparent" to defendant company's CEO and that defendant had no objection to plaintiff's eventual promotion).

5. Wortley also argues that, because of his use of proxies, he technically neither bought nor sold the Sea Dog stock. Although a federal securities fraud plaintiff must have either bought or sold stock, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), there is no similar requirement for defendants. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 192, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("Any person or entity, including a lawyer, accountant, or bank ... may be liable as a primary violator under [federal securities law], assuming *all* of the requirements for primary liability ... are met."); *see also, e.g., AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir.2000) (suit by investors against independent auditors of bankrupt company). Next he argues that he cannot be liable because there was no actual transfer of stock (because Camplin's interest was pledged to the bank). This argument is unpersuasive. *See, e.g., Pelletier v. Stuart–James Co.*, 863 F.2d 1550, 1555 (11th Cir.1989) ("a contract to purchase or sell securities constitutes the purchase or sale of

Dog stock for only $100: (1) to indemnify Camplin for personal guarantees Camplin made on behalf of Sea Dog; (2) to repay $108,000 Camplin loaned to Sea Dog; (3) to allow Camplin's sons to continue to run the business; and (4) to enter into a second written agreement that included these terms.[6] Similarly, the jury was justified in finding Wortley made at least one of these promises with no intent to perform it. For example, with respect to the indemnification promise, Wortley testified, and has maintained throughout this case, that he never intended to indemnify Camplin (of course, he also claims that he never promised to indemnify Camplin). Thus, Wortley's own testimony provided sufficient evidence for the jury to find (if they found, based on the other evidence, that Wortley did make the promise) that he made this promise with no intent to keep it. Next, there was sufficient evidence for the jury to find that Camplin would not have sold the Sea Dog stock to Wortley if Wortley had not made those promises. For example, the jury heard that a prior attempt to sell Sea Dog fell through when the prospective purchaser refused to indemnify Camplin for the personal guarantees. There was also evidence to support a finding that Camplin's reliance on Wortley's false promises was reasonable. For example, there was evidence that Camplin told Wortley that he would not sell the stock without indemnification, that Wortley talked about indemnification in terms specific enough to be viewed as a firm commitment,[7] that both parties thought it would be easy to refinance the bank debt,[8]

securities within the meaning of the antifraud provisions of the securities laws"). Finally, he argues that Camplin is not entitled to recovery because the promises were not sufficiently connected to the purchase of the stock (and thus Camplin cannot prove causation). This argument is without merit; the jury could have found that the promises were part of the consideration given in exchange for the stock. See, e.g., Pelletier, 863 F.2d at 1556.

6. Wortley argues that Camplin's claim should have been dismissed, as a matter of law, because the SPA contained a merger clause, citing U.S. Quest Ltd. v. Kimmons, 228 F.3d 399 (5th Cir.2000). Quest does not support Wortley's argument. Although Quest involved a federal securities fraud claim, there was no merger clause argument concerning that claim (the court discussed the effect of a merger clause on a Texas common law fraudulent inducement claim). Id. at 402–03, 406–07. I am satisfied that, in federal securities fraud law, the effect of a merger clause on the reasonableness of a plaintiff's reliance is a fact question, and that that question was properly presented to the jury in this case. Wortley was entitled to, and did, argue that Camplin's reliance on any promises not contained in the SPA was unreasonable in light of the merger clause. However, the jury also heard evidence that this transaction was completed under significant time pressure (enough pressure that Wortley and his lawyers conducted a limited amount of due diligence), that the parties anticipated ongoing interaction after the sale (such as Camplin's continued work for Sea Dog), and that Camplin would not sign the SPA until Wortley gave explicit oral assurances that it was an interim agreement, that its language was boilerplate, and that a more comprehensive agreement was forthcoming.

7. Camplin testified that both he and Wortley used the word "indemnify," as well as the expressions "hold harmless" and "stand between Camplin and the bank." Wortley testified that he said "hold harmless" and "stand between," but denied saying the word "indemnify." Both parties testified that they considered a variety of ways to refinance or restructure Sea Dog's bank debt. Therefore, the jury could have found that Wortley made a commitment to meet Camplin's demand (that the personal guarantee be relieved) with a flexible approach (thus variable word choice).

8. Both Wortley and Camplin testified that, at the time of the stock sale, they thought it would be easy to refinance the bank debt because: 1) the loan was secured by a federal guarantee (that both parties thought was

that Sea Dog's assets exceeded its liabilities,[9] and that Wortley assured Camplin that he had more than enough personal resources to back up a promise to indemnify (*e.g.*, Wortley owned a number of companies, described himself as specializing in the rehabilitation of financially distressed businesses, and, at one point, said that he could "write a check" to cover the debt if necessary). Finally, there was evidence that Camplin was injured as a result of his reliance on Wortley's false promises (*e.g.*, he was forced to borrow money to buy his guarantee back from the bank).[10]

Wortley makes a similar array of factual and legal challenges to the jury's damages determination.[11] Under federal securities law, a defrauded seller is entitled to recover "the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct," *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), plus "such outlays as were legitimately attributable to the defendant's conduct." *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.1965).

The jury heard evidence[12] from both sides about the value of the Sea Dog stock, including the company's financial difficulties and "going concern" value, the restaurants' working assets, the value of an option on property in Bangor, the bank debt, and the trade-creditor debt. The jury also heard about the things that Wortley gave to or did for Camplin (including any partial performance of the promises). Finally, there was evidence from which the jury could have found that Camplin suffered consequential damages as a result of Wortley's failure to renegotiate the Sea Dog debt and relieve Camplin of his personal guarantees. It is not obvious from the $ 265,000 figure which of this evidence the jury credited, but there is no question that there was sufficient evidence to support

transferable); and 2) the Sea Dog's assets exceeded its liabilities, in large part due to a valuable option on a Bangor property.

9. Camplin argued, and the jury could have found, that if Sea Dog's assets exceeded its liabilities it would make little sense for Camplin to have sold the business without a release (thus giving up valuable assets without being relieved of the corresponding liabilities).

10. Wortley argues that Camplin's own conduct was an intervening cause that broke the link between Wortley's false promises and Camplin's injuries. These factual causation issues were resolved by the jury.

11. For example, Wortley argues that Camplin was not harmed because: there was no evidence that the Sea Dog stock was worth more than the $100 Wortley paid for it; because Camplin was eventually able to buy the stock back as part of a subsequent transaction for only $100; or even, because Camplin was better off in the end (after a series of subsequent maneuvers between him and Wortley, and a turn in bankruptcy court for Sea Dog).

These arguments misperceive the damages rule or give insufficient weight to the jury's factual findings. Wortley also argues that Camplin's claim is barred by "the principles of accord and satisfaction" because Camplin voted to approve Sea Dog's bankruptcy reorganization plan. Accord and satisfaction is an affirmative defense and (absent an unambiguous writing of a type clearly not present here) a fact issue for the jury. *Premier Capital, Inc. v. Doucette*, 797 A.2d 32, 35 (Me. 2002). Wortley neither proposed a jury instruction on this issue nor objected, on this basis, to the instructions as given. This issue is waived.

12. Wortley argues that the jury's verdict is unsupported by sufficient evidence because Camplin did not present expert testimony to prove his damages. There is no such expert testimony requirement in federal securities fraud law; the case Wortley cites, *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323, 1331 (S.D.Fla.2001), is distinguishable because it involves a rule applicable when a court reviews the sufficiency of a class action settlement.

the jury's conclusion.[13]  This was not a simple case.  The parties presented conflicting, often contradictory, accounts of a protracted dispute between two seasoned businessmen.  I see no reason to disturb the jury's verdict.

Accordingly, the motion is DENIED.

So ORDERED.

---

13.  Wortley also asks that I "determine that the damages granted by the jury . . . do not cover any damages relating to the dismissal of the sons, the $108,000 [loan], and/or other claims made by Camplin . . . in order to avoid double damages."  I see no need to dissect or characterize the jury's verdict.